# United States Court of Appeals

*for the*

# Fourth Circuit

---

NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE;
ACTION NC,

*Plaintiffs/Appellees*,

– v. –

NORTH CAROLINA STATE BOARD OF ELECTIONS, et al.,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

## BRIEF OF APPELLEES

Jonathan K. Youngwood
David Elbaum
Jacob Lundqvist
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

Mitchell Douglas Brown
Jeffrey Loperfido
Jacob H. Sussman
Southern Coalition for Social Justice
P.O. Box 51280
Durham, NC 27717
(919) 323-3380

*Counsel for Appellees*

**CORPORATE DISCLOSURE STATEMENT**

Appellee North Carolina A. Philip Randolph Institute has no parent company, and no publicly traded company owns 10% or more of its stock.

Appellee Action NC has no parent company, and no publicly traded company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS........................................................... ii

TABLE OF AUTHORITIES ................................................. iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................2

INTRODUCTION ................................................................3

STATEMENT OF THE CASE............................................................10

SUMMARY OF THE ARGUMENT ....................................................29

STANDARD OF REVIEW ...................................................................31

ARGUMENT ..................................................................32

    I.    The District Court Correctly Held That Plaintiff's Claims Are Not Moot ..............................................................32

    II.    The District Court Properly Granted Summary Judgment for Plaintiffs Because the Law Is Unconstitutional .................................43

        A.    The Strict Liability Voting Law Is Unconstitutional Under the Equal Protection Clause ...........................................43

        B.    The Strict Liability Voting Law Is Unconstitutional Under the Due Process Clause..................................................48

CONCLUSION .................................................................56

CERTIFICATE OF COMPLIANCE.......................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adarand Constructors, Inc. v. Slater*,
528 U.S. 216 (2000) ........................................................... 33

*Aikens v. Ingram*,
652 F.3d 496 (4th Cir. 2011) ............................................. 39

*Audubon of Kan., Inc. v. United States DOI*,
67 F.4th 1093 (10th Cir. 2023) .......................................... 38

*Beaudett v. City of Hampton*,
775 F.2d 1274 (4th Cir. 1985) ............................................ 39

*Carolina Youth Action Project v. Wilson*,
60 F.4th 770 (4th Cir. 2023) ....................................... 50, 52, 53, 56

*Chafin v. Chafin*,
568 U.S. 165 (2013) ..................................................... 37, 42

*Chapin Furniture Outlet Inc. v. Town of Chapin*,
252 F. App'x 566 (4th Cir. 2007) ...................................... 41

*Chi. Joe's Tea Room, LLC v. Vill. of Broadview*,
894 F.3d 807 (7th Cir. 2018) ............................................. 38

*Cloaninger v. McDevitt*,
555 F.3d 324 (4th Cir. 2009) ............................................. 50

*Cmty. Success Initiative v. Moore*,
886 S.E.2d 16 (N.C. 2023) ........................................... 10, 22

*Cotton v. Fordice*,
157 F.3d 388 (5th Cir. 1998) ............................................. 46

*Cunney v. Bd. of Trs. of Grand View*,
660 F.3d 612 (2d Cir. 2011) .............................................. 52

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ...............................................................31

*Doe v. Cooper*,
842 F.3d 833 (4th Cir. 2016) ...............................................................31

*EEOC v. Central Wholesalers*,
573 F.3d 167 (4th Cir. 2009) ...............................................................31

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................... 33, 40

*Gingles v. Edmisten*,
590 F. Supp. 345 (E.D.N.C. 1984) ......................................................12

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................52

*Guttman v. Constr. Program Grp. (In re Railworks Corp.)*,
760 F.3d 398 (4th Cir. 2014) ...............................................................51

*Harness v. Watson*,
47 F.4th 296 (5th Cir. 2022) ...............................................................46

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010) ...............................................................46

*Holloway v. City of Va. Beach*,
42 F.4th 266 (4th Cir. 2022) ...............................................................33

*Hunter v. Underwood*,
471 U.S. 222 (1985) ............................................................................43

*Johnson v. Governor of Fla.*,
405 F.3d 1214 (11th Cir. 2005) ..........................................................46

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) .................................................................... 32, 37

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................52

*Konikov v. Orange Cnty.*,
  410 F.3d 1317 (11th Cir. 2005) .................................................... 52, 56

*Lancaster v. Sec'y of the Navy*,
  109 F.4th 283 (4th Cir. 2024) .............................................. 7, 33, 37

*Louie v. Dickson*,
  964 F.3d 50 (D.C. Cir. 2020) ................................................................38

*Lowe v. Sporicidin Int'l*,
  47 F.3d 124 (4th Cir. 1995) ................................................................49

*MOAC Mall Holdings LLC v. Transform Holdco LLC*,
  598 U.S. 288 (2023)................................................................32

*N.C. State Conf. of NAACP v. McCrory*,
  831 F.3d 204 (4th Cir. 2016) .................................................. passim

*N.Y. State Rifle & Pistol Ass'n. v. City of New York*,
  590 U.S. 336 (2020)................................................................33

*Pakovich v. Verizon LTD Plan*,
  653 F.3d 488 (7th Cir. 2011) ................................................................38

*Porter v. Clarke*,
  852 F.3d 358 (4th Cir. 2017) ................................................................31

*Quillen v. Int'l Playtex, Inc.*,
  789 F.2d 1041 (4th Cir. 1986) ................................................................50

*Ramos v. Louisiana*,
  590 U.S. 83 (2020)................................................................47

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013)................................................................18

*Smith v. Becerra*,
  44 F.4th 1238 (10th Cir. 2022) .......................................... 33, 37, 38

*State Farm Fire & Cas. Co. v. PPL Elec. Utils.*,
  2017 WL 2532005 (E.D. Pa. June 9, 2017)................................................................51

*Steves & Sons v. JELD-WEN, Inc.*,
    988 F.3d 690 (4th Cir. 2021) ............................................................39

*United States v. Flores-Granados*,
    783 F.3d 487 (4th Cir. 2015) ............................................................49

*United States v. Springer*,
    715 F.3d 535 (4th Cir. 2013) ......................................................... 5, 32

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ............................................................47

*Velasco v. Gov't of Indonesia*,
    370 F.3d 392 (4th Cir. 2004) ............................................................31

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................................ 6, 33, 37, 40

*Williams v. Ozmint*,
    716 F.3d 801 (4th Cir. 2013) ............................................................33

## <u>Statutes</u>

N.C.G.S. § 13-1 ....................................................................................15

N.C.G.S. § 15A-1342 (a) ......................................................................16

N.C.G.S. § 15A-1343 (b)(9) ................................................................16

N.C.G.S. § 15A-1344 (a) ......................................................................16

N.C.G.S. § 15A-1344 (d) ......................................................................16

N.C.G.S. § 15A-1368.4 (e)(11)-(12) ....................................................16

N.C.G.S. § 15A-1374 (b)(11a)-(11b) ...................................................16

N.C.G.S. § 163-275(5) ................................................................... 14, 15

N.C.G.S. § 163-55 (a)(2) ......................................................................15

## JURISDICTIONAL STATEMENT

Defendants-Appellants ("Defendants") appeal from the April 30, 2024 final judgment in favor of Plaintiffs-Appellees ("Plaintiffs") and against Defendants on both counts of the Amended Complaint, declaring that North Carolina General Statute § 163-275(5), in its unamended form prior to January 1, 2024, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and enjoining Defendants from enforcing the law.  (JA 1568)

Defendants filed a notice of appeal on May 30, 2024 (JA 1569) and invoke this Court's jurisdiction pursuant to 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

1.      Did the District Court correctly hold that Defendants failed to satisfy their burden to establish that the case had become moot after North Carolina General Statute § 163-275(5) (the "Strict Liability Voting Law" or the "Law") was amended on a prospective basis only, where the District Court could still grant effectual relief to Plaintiffs by declaring the Law in its pre-amendment form unconstitutional and enjoining further enforcement of the Law?

2.      Did the District Court correctly hold that the pre-amendment version of North Carolina General Statute § 163-275(5) was unconstitutional, where Defendants did not dispute the Law's racist history and continuing discriminatory impact, demonstrating an Equal Protection violation that had not been remedied by any subsequent statutory amendments, and where the undisputed record evidence demonstrated that different District Attorneys ("DAs") had interpreted the scienter requirement under the Law inconsistently, thereby demonstrating the Law's inherent vagueness in violation of the Due Process Clause?

**INTRODUCTION**

Plaintiffs North Carolina A. Philip Randolph Institute and Action NC are two voting rights organizations whose core mission involves increasing political participation by members of low-income, minority communities through voter registration drives and get-out-the vote efforts. Plaintiffs commenced this action in September 2020 to challenge a state election law, N.C.G.S. § 163-275(5) (the "Strict Liability Voting Law" or the "Law") as unconstitutional under the Equal Protection and Due Process Clauses of the Fourteenth Amendment. As enacted, the Law criminalized voting on a strict liability basis by voters who had been convicted of a felony and had not been restored to the "right of citizenship" at the time they voted. In response to Plaintiffs' motion for summary judgment, Defendants conceded that the Law was originally enacted and also reenacted with discriminatory intent and that it continues to have a disproportionate impact on Black voters.

After discovery and briefing on Plaintiffs' summary judgment motion had been completed, the North Carolina legislature adopted (overriding the Governor's veto) a statutory amendment in an omnibus election bill ("SB 747") that added a scienter requirement to the Law that became effective on January 1, 2024. The amendment is not retroactive. Defendants can still enforce the old version of the Law against voters who voted in any election prior to January 1, 2024, and,

significantly, there is no statute of limitations for such prosecutions. Defendants conceded before the trial court that SB 747 does not restrict DAs from continuing to enforce the pre-amendment version of the Law going forward. *See* JA 1510 ("I agree that the old law is a felony, which has no statute of limitations. That the new law would not apply retroactively. So, yes, it is a possibility that that could happen."). Nonetheless, Defendants suggested that the case had become moot once SB 747 was enacted and requested that the District Court dismiss the case as moot.

On January 2, 2024, Magistrate Judge Joe L. Webster issued a recommendation (the "January 2024 R&R") that Plaintiffs' motion for summary judgment be denied and the case dismissed because Plaintiffs could no longer demonstrate they had standing after SB 747 became effective. The Magistrate Judge did not evaluate whether Plaintiffs' claims had become moot. The Magistrate Judge did not reach Plaintiffs' motion on the merits.

Following further briefing and argument, in two separate opinions, District Judge Loretta C. Biggs rejected the January 2024 R&R and granted Plaintiffs' motion for summary judgment with respect to both causes of action asserted. The District Court found that the Magistrate Judge had applied the "incorrect standard and burden" by analyzing Plaintiffs' continued interest in the litigation under the doctrine of standing, not mootness. When considered under the proper standard,

and asking whether Defendants could meet their burden of demonstrating mootness, the District Court found that the case had not become moot because the court could still grant effectual relief to Plaintiffs. The trial court further noted that there were many "challenged aspects of the [Law] that have not been alleviated" by the partial, prospective amendment. The District Court went on to find that the Law in its pre-amendment form violates the Equal Protection Clause given the undisputed evidence of discriminatory intent and discriminatory effect; and also violates the Due Process Clause given the undisputed record evidence demonstrating that different DAs had interpreted the statute differently as to whether scienter is a required element of the offense.

Defendants appeal the District Court's decisions, challenging both its findings that the partial amendment to the Law did not render the action moot and that the Law is unconstitutional under the Equal Protection and Due Process Clauses. The District Court rightly rejected Defendants' arguments. This Court should affirm, for the following reasons:

*First*, the District Court correctly concluded that Plaintiffs continue to have a concrete interest in this litigation and Defendants have not established that the case is moot. A case becomes moot only when it is impossible for the court to "grant *any* effectual relief whatever" to Plaintiffs. *United States v. Springer*, 715 F.3d 535, 540 (4th Cir. 2013). In addition, Defendants "bear[] the burden to establish

that a once-live case has become moot." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022). Here, the court could—and did—grant effectual relief by enjoining further enforcement of the Law in its pre-amendment form. Absent such relief, the pre-amendment Law could be continuously enforced for violations before January 1, 2024, thereby causing confusion among prospective voters about the current state of the Law and chilling voter participation. This would directly impact Plaintiffs' core mission as organizations encouraging voter participation through get-out-the vote activities and voter registration drives, especially among historically excluded and underserved communities such as those that have been previously involved with the criminal justice system. *See* JA 1241-1242; JA 1248-1250. If the pre-amendment Law could still be enforced, Plaintiffs' efforts would be burdened by the need to educate voters about the current state of the Law and their eligibility to vote, and fewer eligible voters may be willing to vote, the very same issues at play in this case before the amendment. Defendants concede that SB 747 did not limit the DAs' ability to prosecute voters for any violations before January 1, 2024. An injunction thus provided effectual relief to Plaintiffs by precluding any further impact to Plaintiffs' core mission from the Law.

In addition, Defendants' complaint that the District Court should have analyzed their mootness arguments on a "claim-by-claim" basis should be rejected. As this Court recently held, "[s]ince mootness depends on the court's ability to

grant effectual relief, it follows that mootness hinges on the type of relief sought."

*Lancaster v. Sec'y of the Navy*, 109 F.4th 283, 289 (4th Cir. 2024). Defendants'

suggestion that mootness depends on the specific underlying legal theories alleged,

so that Equal Protection or Due Process claims seeking the same type of relief

would be analyzed separately, is inconsistent with *Lancaster*, as well as the out-of-

Circuit cases that Defendants cite. Defendants' mere second-guessing of the

District Court's sound analysis fails to meet their burden of demonstrating that

SB 747 rendered Plaintiffs' claims moot.

*Second*, the District Court correctly held that the Law violates both the Equal

Protection and Due Process Clauses of the Fourteenth Amendment. Defendants

cannot save the Strict Liability Voting Law by claiming that a 1971 amendment to

the North Carolina constitution (or the parallel 1973 amendment to a different

statute) indirectly cleansed the Law's undisputed racist history and impact. In

passing the constitutional amendment, the Legislature did not say anything about

the Strict Liability Voting Law at all. The constitutional amendment only changed

the scope of individuals who are ineligible to vote in elections in North Carolina.

The amendment said nothing about the potential criminal sanctions if an ineligible

person voted improperly or the state of mind required to find a person guilty of

such a crime. The Law established those mandates with discriminatory intent in

1877 and 1899 and they remain unchanged. Defendants have not, and cannot,

point to any substantive amendment or reenactment of the Law itself at any time since 1899.  All of the Law's key features, including its lack of scienter requirement and the conduct subject to criminal prosecution, have remained unchanged since 1899.  The District Court correctly rejected Defendants' indirect cleansing theory as unsupported and unprecedented, finding that the cited amendments to different provisions did nothing to undo the discriminatory history that continues to permeate the Law and disproportionately impact Black North Carolinians.

The District Court also properly held the Strict Liability Voting Law unconstitutional under the Due Process Clause.  The undisputed record established that different DAs tasked with enforcing the Law have applied inconsistent interpretations and reached inconsistent enforcement decisions.  Defendants' assertion that this challenge is "unpled" overlooks that Plaintiffs' complaint alleged that the Law violated the Due Process Clause because it was void for vagueness and attached several of the documents that reflected the inconsistent interpretations.  Nothing more was required under Federal Rule 8.  In addition, on this record, Defendants cannot justify this arbitrary and inconsistent enforcement as merely an exercise of "prosecutorial discretion."  This argument misreads the record and overlooks the specific statements showing that some DAs read the Law as requiring intent as an essential element to obtain a conviction while others do

not.  Notably, Defendants did not submit any affidavits or other evidence in support of their effort to recast letters interpreting the statute as "prosecutorial discretion."  The District Court correctly held that evidence showing "that some [DAs] believed that the [Law] included a requirement of intent while others did not" compelled the conclusion that the Law is unconstitutionally vague.

This Court should affirm the District Court's decision.

## STATEMENT OF THE CASE

### A. The Discriminatory Intent Underlying the Enactment of the Strict Liability Voting Law in 1877 and Reenactment in 1899 Is Undisputed

North Carolina's "long history of race discrimination generally and race-based vote suppression in particular" is undisputed. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016). The North Carolina Supreme Court recently summarized the State's "profoundly troubling portrait of a legal system used time and again to deny African Americans a voice in government by banning or restricting their participation in elections." *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 38 (N.C. 2023) ("*CSI*").

After the Civil War, white Conservatives rushed to forestall Black citizens' newly-gained voting rights by, among other things, seizing on the state's criminal disenfranchisement law. JA 348. In 1875, Conservatives called a constitutional convention to limit Black civil rights and political participation. JA 353. Thirty constitutional amendments were proposed, including a prohibition on interracial marriages and a mandate that public schools be segregated by race. JA 353-354. "Other amendments that did not mention race had the deliberate effect of reducing the political influence of African Americans." *CSI*, 886 S.E.2d at 25. One amendment denied the franchise to "any person who, upon conviction or confession in open Court, shall be adjudged guilty of a felony, or of any other

crime infamous by the laws of [the] State . . . unless such a person shall be restored to the rights of citizenship in a mode prescribed by law." JA 354. The convention understood that this criminal disenfranchisement provision would disproportionately impact Blacks, since "nearly every man convicted of a felony is a negro." JA 356. All of the proposed amendments were ratified in 1876. JA 354.

In 1877, the General Assembly adopted the Strict Liability Voting Law:

> If a person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged conviction; but his answer to such questions shall not be used against him in any criminal prosecution, *but if any person so convicted shall vote at any election, without having been legally restored to the rights of citizenship, he shall be deemed guilty of an infamous crime, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisonment at hard labor not exceeding two years, or both*.

JA 410 at § 62 (emphasis added). The Law did not require intent or knowledge. Instead, criminal liability attached even if the individual was not aware that he was ineligible to vote. The lack of an intent requirement set the Strict Liability Voting Law apart from other offenses adopted in the 1877 law, including the swearing of a false oath, registering in more than one precinct, impersonating a legally-registered voter, and voting more than once in a single election, which all required fraudulent intent. JA 355-356.

The Strict Liability Voting Law provided a means for the 1877 General Assembly to restore the "purity of the ballot" and discriminate "not against [an

individual] Negro directly but against certain characteristics of his race"—all in a manner that was designed to escape scrutiny under the Fourteenth and Fifteenth Amendments.  JA 356.

Notwithstanding systematic efforts by Conservatives to curtail Black political participation, Black individuals slowly gained political influence in the 1890s.  In response, Conservatives stoked racial tensions by making the threat of "negro domination" their rallying cry.  JA 365.  When Conservatives regained power in 1898, they sought to restore white rule.  JA 366.

In 1899, the General Assembly passed an amendment to the state constitution to effectively strip Black men of their voting rights.  *Id.*  The amendment included a literacy test, but exempted anyone who was eligible to vote before the first Reconstruction Act restored Black citizens' voting rights, and a poll tax.  JA 366-367.  The amendment was "specifically designed to disenfranchise [B]lack voters."  *Gingles v. Edmisten*, 590 F. Supp. 345, 359 (E.D.N.C. 1984), *aff'd in part, rev'd in part sub nom. Thornburg v. Gingles*, 478 U.S. 30 (1986).

The General Assembly also reenacted the Strict Liability Voting Law almost verbatim:

> If any person be challenged as being convicted of any crime which excludes him from the right of suffrage, he shall be required to answer any questions in relation to such alleged convictions; but his answer to such questions shall not be used against him in any criminal prosecution, *but if any person so convicted shall vote at the election without having been restored*

> *to the rights of citizenship he shall be guilty of an infamous crime*
> *and punished by a fine not exceeding one thousand dollars or*
> *imprisoned at hard labor not exceeding two years or both.*

JA 429 at § 72 (emphasis added). Like the 1877 version before it, the 1899 version

did not require intent.

Defendants "do not dispute that the 1877 and 1899 versions of the

challenged law were enacted with discriminatory intent," and "agree that the

historical record shows that these versions of the law were enacted with the

specific intent to disenfranchise Black voters." Opening Br. at 6; *see also id.* at 30

("Defendants do not contest that the historical background from the original

enactments of 1877 and 1899 is indefensible.").

### B. The Key Features of the Strict Liability Voting Law Have Remained Intact Since 1899

It is undisputed that "the scienter or mens rea requirement" (prior to the

enactment of SB 747) and the "acts subject to prosecution" under the Strict

Liability Voting Law have never been amended since the Law was reenacted in

1899, and that the offense level "remains substantially the same." *See* JA 416, JA

419; *see also* JA 423 (admitting that neither the law enacted in 1899 nor the pre-

2024 codified statute "has a mens rea requirement, and both penalize the same

conduct," while stating that other features "are slightly different").

In 1931, the General Assembly reenacted the Strict Liability Voting Law,

streamlined its language, and clarified that it applied to primary elections. JA 432,

JA 435 at Ch. 348, §§ 9(3, 4, 6) & § 10(5).  But the Law's key features remained

unchanged.  Between 1931-2024, the General Assembly only changed one word,

replacing "him" with "the person."  *Compare id.*, *with* N.C.G.S. § 163-275(5).

In 1968, a State Constitution Study Commission presented proposed

revisions to the state constitution.  With respect to Article VI—"Suffrage and

Eligibility to Office"—the Commission noted that its "substantive changes

proposed . . . are few."  JA 529.  The felony disenfranchisement provision was

expanded to include persons who had been convicted of federal crimes or felonies

committed in another state.  The proposed language read:

> <u>Disqualification of felon</u>.  No person adjudged guilty of a felony
> against this State or the United States, or adjudged guilty of a
> felony in another state that also would be a felony if it had been
> committed in this State, shall be permitted to vote unless that
> person shall be first restored to the rights of citizenship in the
> manner prescribed by law.

JA 499.  In 1971, the State adopted an amended constitution with that provision,

which remains in effect today.  JA 618-655.  In 1973, the General Assembly

revised the election laws and codified the revised felony disenfranchisement

provision of the State Constitution, N.C.G.S. § 163-55(a), but did not modify the

Strict Liability Voting Law, N.C.G.S. § 163-275(5).  *See* JA 657-679, JA 681-685,

JA 687-694.  Nothing in the text or history of the state constitutional amendment or

the amendment to Section 163-55(a) mentioned Section 163-275(5), the offense

level for violating Section 163-275(5), or the strict liability nature of

Section 163-275(5).

### C. The Strict Liability Voting Law Does Not Define Which Prospective Voters Are Subject to Potential Punishment

The Strict Liability Voting Law makes it a felony "[f]or any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law." N.C.G.S. § 163-275(5). But it does not define which crimes "exclude[] the person from the right of suffrage" or how "the right of citizenship" may be restored.

To understand who is "exclude[d] . . . from the right of suffrage," a prospective voter must look to N.C.G.S. § 163-55 (a)(2):

> [T]he following classes of persons shall not be allowed to vote in this State: . . . Any person adjudged guilty of a felony against this State or the United States, or adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, unless that person shall be first restored to the rights of citizenship in the manner prescribed by law.

To determine how to be "restored to the right of citizenship," a prospective voter must look to N.C.G.S. § 13-1 (the "Citizenship Restoration Law"):

> Any person convicted of a crime, whereby the rights of citizenship are forfeited, shall have such rights automatically restored upon the occurrence of any one of the following conditions:
>
> (1) The *unconditional discharge* of an inmate, of a probationer, or of a parolee by the agency of the State having jurisdiction of that person or of a defendant under a suspended sentence by the

court . . .

> (4) With regard to any person convicted of a crime against the United States, the *unconditional discharge* of such person by the agency of the United States having jurisdiction of such person . . .

> (5) With regard to any person convicted of a crime in another state, the *unconditional discharge* of such person by the agency of that state having jurisdiction of such person[.]

N.C.G.S. § 13-1 (emphases added). Neither the Citizenship Restoration Law nor any other statute defines the term "unconditional discharge." Nor has any court decision defined the term. In addition, North Carolina law requires that people with felony convictions pay court costs, fees, and restitution as "conditions" of their probation, parole, or post-release supervision. *See* N.C.G.S. §§ 15A-1343 (b)(9) (probation), 15A-1374 (b)(11a)-(11b) (parole), 15A-1368.4 (e)(11)-(12) (post-release supervision). Courts may extend probation to five years based on failure to pay these amounts. *Id.* §§ 15A-1342 (a), 15A-1344 (a), (d). Individuals may not realize that the period before their voting rights are restored under the Citizenship Restoration Law and Strict Liability Voting Law may be extended if they fail to pay these costs and fees.

Prospective voters with felony convictions have been confused as to when their voting rights are restored. *See, e.g.*, JA 704 (DA declination letter noting "a pattern of confusion on the part of several felons with respect to their understanding concerning their eligibility to vote"); JA 708-709 (DA declination

letter describing notice issues in that voters "did not understand or were not informed that their citizenship rights had not been restored pursuant to their felony convictions"). The NCSBE's general counsel, testifying as a Rule 30(b)(6) designee, conceded during his deposition that "it's absolutely possible that someone could be confused about how rights are restored following a felony conviction in North Carolina." JA 726; *see also* JA 733 (describing a "general understanding that people could be confused about" their voting rights).

While the NCSBE has taken steps to educate individuals with felony convictions on when they regain the right to vote, its general counsel testified he had "serious doubts" as to whether those measures have "removed all instances where a voter will unknowingly commit [the] crime" of voting before sentence completion. JA 725; *see also id.* ("I have serious doubts as to whether every person who is advised of their rights about voting or not while serving a felony sentence . . . fully internalizes that when they're advised of that and can act accordingly and can remember that . . . a year down the road when they're still on a probation sentence."). In fact, records from the investigations and prosecutions brought under the Law (*see infra* pages 19-20) include extensive evidence of voter confusion and demonstrate that his "serious doubts" are justified.

**D.   Political Pressure Renders the Strict Liability Voting Law a Renewed Focus of Investigation and Enforcement Actions in 2016**

In 2013, the U.S. Supreme Court struck down Section 5 of the Voting Rights Act, which had required "preclearance" of voting procedures in North Carolina counties covered by judicial review. *Shelby Cnty. v. Holder*, 570 U.S. 529 (2013). Within hours of the ruling, the General Assembly began to modify the procedures for registering and voting through an omnibus election bill that significantly restricted access to the ballot box. JA 382-383. In 2016, the Fourth Circuit invalidated the resulting law because it had "target[ed] African Americans with almost surgical precision." *McCrory*, 831 F.3d at 214.

Following the *McCrory* decision and the 2016 election, the number of NCSBE investigations of potential violations of the Strict Liability Voting Law sharply increased. The State Board conducted an election audit, which the NCSBE acknowledged was "in part a response to political pressure." JA 726. The audit identified 441 individuals with felony convictions who were suspected of voting before sentence completion. JA 771. Sixty-eight percent of the individuals investigated were Black. JA 804. The number of cases the NCSBE referred to DAs for prosecution increased from 9 cases in 2015, to 422 cases in 2017. JA 767.

In hindsight, the NCSBE concluded the 2016 audit resulted in "significant collateral impact" in that "a lot of people [were] caught up in the investigation and referred for prosecution, when, as the audit makes quite plain, a lot of these folks

didn't realize they were doing anything wrong." JA 728. The audit report recognized the violations were often unintentional, and "education and understanding of state law appear to be the primary problem." JA 774. The NCSBE's general counsel also admitted that "the focus on felon voting investigations could result in people who have a felony record but are nonetheless eligible to vote may be confused about their rights and whether they could be prosecuted for voting." JA 733.

The NCSBE continues to investigate and refer cases for prosecution under the Strict Liability Voting Law. JA 722. The NCSBE investigates all potential violations, and the Board's legal team has advised that every case meeting the statutory requirements should be referred for prosecution. JA 732, JA 825. There is no dispute that the NCSBE has referred cases where there was "no evidence that the voter acted knowingly in violation of the Strict Liability Voting Law." JA 860.

E.    **The Strict Liability Voting Law Has Been Inconsistently Enforced by the NCSBE and State DAs**

The Strict Liability Voting Law has not been enforced in a uniform or consistent manner. While the statute does not include an intent element, certain NSCBE investigators and DAs have declined to prosecute voters based on their conclusion that a violation requires evidence of intentional conduct. On at least two occasions, the NCSBE declined to refer cases for prosecution where the individuals had cognitive impairments that rendered it unlikely they voted with

fraudulent intent. *See* JA 979. A 30(b)(6) representative of the NCSBE described the failure to refer these cases as an "error." *See* JA 986. In other cases, however, the NSCBE has referred cases even when it was clear that the individual voted in good faith. *See* JA 826.

Similarly, DAs have repeatedly declined to prosecute voters where there was no evidence of intent. For example, the DA for Durham County wrote in a declination letter to the NCSBE that "[i]t is our belief that charges would require some showing of knowledge that . . . [the] individual's right to vote had been suspended." JA 1022. The DA for Bladen, Brunswick, and Columbus counties refused to prosecute seven cases because the State Board's "investigation ha[d] revealed a pattern of confusion on the part of several felons with respect to their understanding concerning their eligibility to vote" and he "question[ed] the wisdom of prosecuting offenders who lack the requisite criminal intent, most of whom were operating in good faith." JA 704. The DA for Buncombe County reached the same conclusion "[i]n that this NCSBE investigation does not include documentation that the subject had actual knowledge that his voting privileges were suspended while on probation" and there was "little chance the State would be able to satisfy its burden of proof at trial." JA 1033; *see also* JA 1023, JA 1024 (declining prosecutions for same reasons). In other instances, however, DAs have charged voters who "said their votes were an unwitting mistake" and "a product of

not understanding the voter forms they signed and not knowing the law." *See* JA 1036.

### F. The Strict Liability Voting Law's Disproportionate Impact on Black Voters Is Undisputed

In 2018, the Alamance County DA charged 12 individuals with violating the Strict Liability Voting Law. JA 1073-1074. Nine of the 12 were Black. *Id.* In 2019, the DA of Hoke County charged four individuals with violating the Law. *Id.* All four were Black. *Id.*

Approximately 22% of North Carolina's general population is Black. JA 1156. By contrast, Black citizens represent 63.6% of all individuals investigated by the NCSBE under the Strict Liability Voting Law between 2015-2022. *See* JA 804-808, JA 1161-1165. The Chief Investigator of the NCSBE acknowledged that this difference was "significant." JA 850. Similarly, in 2015-2016 and 2018-2022, Black citizens represented 56.3% of the individuals referred for prosecution. *See* JA 1161-1165.

Black citizens are overrepresented in the NCSBE's investigations compared to the overall percentage of Black individuals incarcerated in state and federal prisons in North Carolina, 50% and 51%, respectively. *See* JA 1170-1171, JA 1173-1222. Black voters are similarly overrepresented in NCSBE investigations compared to the percentage of individuals on probation or under post-release supervision—the individuals most at risk of prosecution under the Law. Just over

40% of individuals in this group are Black.  JA 1224-1237; *CSI*, 886 S.E.2d at 35 (42% of individuals on felony supervision are African American).

Defendants "do not contest the district court's finding that [the Law] currently has a disparate impact on Black North Carolinians."  Opening Br. at 30; *see also* JA 1551 (noting Defendants' concession that "the law currently impacts African-Americans at a higher rate than it does other citizens").

### G. Plaintiffs Move for Summary Judgment and The North Carolina General Assembly Amends the Law on a Prospective Basis Only

Plaintiffs moved for summary judgment on June 15, 2023.  JA 289-290.  In support of their motion, Plaintiffs submitted affidavits from representatives of NC APRI and Action NC explaining that prosecutions under the Strict Liability Voting Law in recent years have "really frightened people who might otherwise have been willing to register to vote and cast a ballot."  JA 1242.  As a result, the Law has "impeded [Plaintiffs'] core mission of increasing participation in low-income and minority neighborhoods."  JA 1250; JA 1244.  Defendants did not challenge these affidavits or put in competing evidence to dispute the facts therein.

After briefing on Plaintiffs' motion was complete, the North Carolina General Assembly passed SB 747, which, among other things, amended the Law to add a scienter requirement.  *See* Session Law 2023-140, SB 747 § 38.  The Law became effective on January 1, 2024 and only applies prospectively.  *See id.* § 50. Nothing prohibits continued prosecutions under the old version of the Law for

alleged violations that occurred before January 1, 2024.  The summary judgment record reflected that over 200 cases remained subject to review for potential prosecution by DAs across the state at the time of summary judgment.  *See* JA 1341-1367.  There may have been additional investigations opened with respect to other elections prior to January 1, 2024.  Moreover, past investigations and prosecutions have been influenced by political pressure, which similarly could influence future prosecutions for past violations.  *See supra* page 17-19. Defendants did not submit any evidence demonstrating that they would voluntarily cease from prosecuting any alleged past violations, and unsupported arguments by Defendants' counsel about the likelihood of future prosecutions are not evidence and are not sufficient to establish mootness.

> **H.** **The Magistrate Judge Recommends Dismissal for Lack of Standing and Plaintiffs File an Objection**

On October 27, 2023, Magistrate Judge Webster ordered that the parties submit supplemental briefing to address the potential impact of SB 747 on Plaintiffs' claims.  JA 38 (10/27/2023 Text Order).  In response to that order, Defendants argued that the amended Law would moot the entire action and requested that the Court "dismiss this action as moot."  JA 1389-1393.  On November 14, 2023, Judge Webster heard oral argument.  On January 2, 2024, the Magistrate Judge issued the January 2024 R&R recommending that Plaintiffs' motion be denied as moot and the action be dismissed "for lack of subject matter

jurisdiction because Plaintiffs lack standing to pursue their claims." JA 1397.

Plaintiffs filed an objection to the January 2024 R&R on January 16, 2024, arguing that (i) the Magistrate Judge incorrectly denied Plaintiffs' motion for summary judgment by applying the test for standing, analyzed at the outset of an action, rather than mootness, which is the proper test at subsequent stages of the case; (ii) Plaintiffs continue to have a concrete interest in the outcome of the action even after the January 1, 2024 amendment became effective; and (iii) summary judgment should be granted for Plaintiffs on the merits. JA 1420-1441. Defendants filed a response on January 30, 2024. JA 1445-1461. In their response, Defendants argued that, even though they requested dismissal of Plaintiffs' claims as moot, they bore no burden to demonstrate mootness because the Magistrate Judge had made a "*sua sponte* assessment of subject matter jurisdiction" and in doing so applied "the correct legal standard" of standing rather than mootness. JA 1448-1456; *see also* JA 1456 ("[W]hen the Magistrate Judge took up the issue of subject matter jurisdiction *sua sponte*, the burden remained with the party asserting jurisdiction, Plaintiffs, and did not shift to Defendants."). Defendants made no attempt to demonstrate that it would be impossible for the court to grant any effectual relief whatever—the applicable standard for mootness—let alone address such arguments separately for each claim brought by Plaintiffs.

On March 7, 2024, the District Court held oral argument on Plaintiffs' objection.  During argument, Defendants conceded that prosecutions could still occur under the old version of the statute and did not identify any restrictions on prosecutors' ability to proceed with such prosecutions.  *See* JA 1510 ("I agree that the old law is a felony, which has no statute of limitations.  That the new law would not apply retroactively.  So, yes, it is a possibility that that could happen.").

## I.    The District Court Rejects the January 2024 R&R

On April 22, 2024, the District Court rejected the January 2024 R&R, finding that the Magistrate Judge had applied "the wrong standard and burden" in finding that Plaintiffs did not maintain a concrete interest in the litigation after the statutory amendment was passed.  JA 1541.  The court stated that "to suggest that Plaintiffs' claims are moot solely because the scienter requirement had been inserted is inaccurate," and the Magistrate Judge did "not venture to address whether the addition of the scienter requirement resolves all, or any portion of, the challenged aspects of" the Law, defined by the District Court as the "Challenged Statute."  JA 1540.  The court proceeded to find that "there remain challenged aspects of the Challenged Statute that have not been alleviated by the scienter requirement's addition" and "it is certainly possible for the Court to grant effectual relief to Plaintiffs, particularly by declaring the Challenged Statute unconstitutional and enjoining the enforcement of [the] Challenged Statute."  JA 1540-1541.  By

way of example, the District Court pointed to Plaintiffs' argument, "among other things, that the Challenged Statute's criminalization of voting before an individual has 'been restored to the right of citizenship' . . . is unconstitutionally vague." JA 1540. Because that issue "was an original concern of Plaintiffs . . . before the amendment," the added scienter requirement in the Amended Statute did not moot Plaintiffs' challenge to the Law. *Id.*; *see also* JA 1542 ("[T]his matter is not rendered moot by Senate Bill 747, and the litigation shall proceed, specifically to address Plaintiffs' Summary Judgment Motion.").

### J.    The District Court Grants Summary Judgment for Plaintiffs

In a separate memorandum opinion, the District Court granted Plaintiffs' motion for summary judgment on both causes of action asserted in the Amended Complaint.

With respect to Plaintiffs' Equal Protection claim, the District Court noted Defendants' "extraordinary and telling concession" that the Law was enacted and reenacted with discriminatory intent and "currently impacts African-Americans at a higher rate than it does other citizens." JA 1551. The District Court rejected Defendants' "indirect cleansing" theory, finding no support for their argument that "amending one law—namely, the 1971 Constitution—can indirectly cleanse a wholly distinct law—namely, the Challenged Statute." JA 1555. As the court explained, "[h]ad the Legislature wanted to cleanse the Challenged Statute of its

discriminatory taint, it could have directly amended the Challenged Statute," but it did not. JA 1556. Finally, the District Court cited this Court's decision in *McCrory*, which explained that "a subsequent change does not cleanse the discriminatory taint if the law continues to place a lingering burden on Black voters." JA 1557 (citing *McCrory*, 831 F.3d at 240-41). Here, "Defendants concede that Black voters are still disproportionately impacted by the Challenged Statute," disproving any cleansing through the constitutional amendment. *Id.*

With respect to Plaintiffs' Due Process claim, the District Court found the Law was not unconstitutionally vague because it did provide adequate notice of the prohibited conduct. *See* JA 1559-1563. The District Court held, however, that the Law was unconstitutionally vague because it "lacks sufficient standards to prevent arbitrary and discriminatory enforcement." JA 1566. In support of this finding, the District Court pointed to the undisputed evidence "demonstrating . . . inconsistency in District Attorneys' interpretation and enforcement of the Challenged Statute," *i.e.*, "that some believed that the Challenged Statute included a requirement of intent while others did not." JA 1565.

The District Court emphasized the distinction between "the decision to pursue a case being based on whether or not the prosecutor believes sufficient evidence is present," and "the decision to pursue a case being based on whether or not the prosecutor believes the criminalizing statute requires intent." JA 1564.

The District Court concluded that different DAs had different interpretations of the Law's intent requirement, thereby demonstrating the statute's inherent vagueness. The District Court pointed to evidence in the record showing "clearly inconsistent" enforcement by District Attorneys in North Carolina, some of whom "have declined to prosecute violations of the Challenged Statute due to their belief that charges would require some showing of knowledge that the individuals' right to vote had been suspended," whereas others "prosecuted voters who voted before their rights to citizenship were restored without any evidence of intent." JA 1565. In view of this evidence, the District Court declared the Law unconstitutional under the Due Process Clause. JA 1566.[1]

---

[1] The District Court did not address whether evidence of inconsistent referrals by the NCSBE similarly demonstrated inconsistent interpretation and application of the Law. *See* JA 1565-1566.

## SUMMARY OF THE ARGUMENT

The District Court correctly held that Plaintiffs' claims are not moot and that the Law in its pre-amendment form violates both the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

*First*, Plaintiffs retain a concrete interest in this litigation because the District Court could grant effectual relief to Plaintiffs by enjoining the Law in its pre-amendment form even after SB 747 was passed. As Defendants concede, the Law could continue to be enforced without any statute of limitations for any violations before January 1, 2024 absent such an injunction. In enjoining further enforcement of the Law, the District Court provided real relief that was far from academic, permanently removing a longstanding chilling effect on North Carolina voters that has impacted Plaintiffs in carrying out their core mission of increasing voter participation among low-income, minority voters.

*Second*, the District Court correctly granted Plaintiffs' motion for summary judgment on both claims asserted in the Complaint. With respect to Plaintiffs' Equal Protection challenge, Defendants conceded both the Law's discriminatory intent and discriminatory impact, and Defendants cannot save the Law through an unsupported theory that a constitutional amendment that did not even mention the Law indirectly "cleansed" the racist history and impact of the Law. With respect to Plaintiffs' Due Process challenge, the District Court correctly held that the Law

is unconstitutionally vague given the undisputed record evidence showing that different DAs have interpreted the Law's *mens rea* requirement differently. Some DAs have declined prosecution based on their belief that doing so would require evidence of intent, whereas others have prosecuted voters without any such evidence. This clearly inconsistent pattern demonstrates the Law's inherent vagueness, and Defendants' mere labeling of the evidence as reflecting "prosecutorial discretion" cannot reconcile these profoundly different interpretations and applications of the Law by those tasked with enforcing it.

## STANDARD OF REVIEW

While a district court's mootness determination is reviewed de novo,

*Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017), the district court's findings of

fact with respect to jurisdiction are reviewed under a "clearly erroneous" standard.

*See, e.g.*, *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).  On the

merits, a "district court's rulings concerning the constitutionality of a state statute"

are reviewed de novo.  *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016).  This

Court will uphold a district court's grant of summary judgment unless it finds that

a reasonable jury could return a verdict for the nonmoving party on the evidence

presented.  *See, e.g.*, *EEOC v. Central Wholesalers*, 573 F.3d 167, 174 (4th Cir.

2009).  A party that opposes summary judgment "must rely on more than

conclusory allegations, mere speculation, the building of one inference upon

another, or the mere existence of a scintilla of evidence."  *Dash v. Mayweather*,

731 F.3d 303, 311 (4th Cir. 2013).

## ARGUMENT

## I.    The District Court Correctly Held That Plaintiff's Claims Are Not Moot

The District Court correctly held that it could still grant effectual relief on Plaintiffs' claims and, accordingly, Defendants had failed to demonstrate that Plaintiffs' claims were mooted by SB 747.  There is no dispute that SB 747 was not retroactive and the DAs can still bring prosecutions under the pre-amendment Law for any potential violations before January 1, 2024, without any statute of limitations.  As a result, the legislative amendment did not fully resolve Plaintiffs' claims and Plaintiffs retain a sufficient interest in the outcome of the case to proceed.

This Court has recognized that the mootness doctrine "constitutes a relatively weak constraint on federal judicial power."  *Springer*, 715 F.3d at 540. "A case becomes moot *only* when it is impossible for a court to grant *any* effectual relief whatever to the prevailing party."  *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)) (emphasis in *Springer*).  As long as the plaintiffs retain a "concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Knox*, 567 U.S. at 307-08; *see also MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 295 (2023) (same).

Unlike questions of standing at the outset of a case, the defendant "bears the burden to establish that a once-live case has become moot."  *West Virginia v. EPA*,

597 U.S. at 719 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), and *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (per curiam)); *see also Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022) ("The defendant bears the burden of establishing that a 'once-live case has become moot.'") (quoting *West Virginia*) (cited by Defendants).  "Since mootness depends on the court's ability to grant effectual relief, it follows that mootness hinges on the type of relief sought." *Lancaster*, 109 F.4th at 289.[2]  "A claim may be mooted 'when the claimant receives the relief he or she sought to obtain through the claim,' because the court no longer 'has [] effective relief to offer.'" *Williams v. Ozmint*, 716 F.3d 801, 809 (4th Cir. 2013) (citation omitted). In other words, where a litigant has already received "the precise relief that petitioners requested in the prayer for relief in their complaint," the case may be rendered moot.  *N.Y. State Rifle & Pistol Ass'n. v. City of New York*, 590 U.S. 336, 338-39 (2020) (finding case moot based on legislative amendment); *Holloway v. City of Va. Beach*, 42 F.4th 266, 275 (4th Cir. 2022) (finding challenge to election

---

[2]  While Defendants argued before the District Court that standing, not mootness, provided the proper standard for analyzing Plaintiffs' continued interest in the litigation, they have abandoned that position on appeal and concede that mootness provides the appropriate standard. *Compare* JA 1448-1453, *with* Opening Br. at 22.  Defendants did not seek summary judgment on the grounds that Plaintiffs lacked organizational standing to assert their claims and Defendants do not challenge Plaintiffs' organizational standing on appeal.

scheme mooted because "plaintiffs already have gotten all that they asked for in their amended complaint," and "[t]he only thing a court can add now is an advisory opinion as to the legal status of an effectively defunct electoral system").

Here, however, Plaintiffs' challenge to the Law was not mooted by the Legislature's partial amendment to the Law on a prospective basis. In their Complaint, Plaintiffs requested a declaration that the Law violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and that the District Court permanently enjoin Defendants from enforcing the Law. *See* JA 102; JA 188-189. Defendants conceded before the District Court that prosecutions under the pre-amendment Law could still occur even after SB 747 became effective. *See* JA 1510 ("[Y]es, it is a possibility that that could happen."). Defendants also conceded that there is no applicable statute of limitations for prosecutions under the pre-amendment Law. *Id.* Far from issuing an advisory opinion, the District Court therefore could grant effectual relief to Plaintiffs by enjoining further enforcement of the pre-amendment Law.

The Legislature's partial amendment also did not grant Plaintiffs the relief requested in their Complaint because it left unabated the risk of significant voter confusion from continued prosecution of the pre-amendment Law. New prosecutions under the pre-amendment Law would generate publicity and voter confusion about the state of the Law and could lead prospective voters to second-

guess their eligibility and avoid the ballot box altogether so as to not expose themselves to a perceived risk of prosecution. There was ample evidence in the record to support the District Court's conclusion. *See, e.g.*, JA 1242 (declaration of Executive Director, North Carolina A. Philip Randolph Institute stating that "[r]ecent prosecutions under [the Law] have really frightened people who might otherwise have been willing to register to vote and cast a ballot."); JA 1249-1250 (declaration of Executive Director, Action NC, stating that "Action NC has had a significantly harder time persuading individuals with criminal convictions to participate in the democratic process" as a result of prosecutions under the Law); JA 1255 (declaration of Co-Director, Down Home North Carolina ("DHNC"), stating that "DHNC has had a significantly harder time persuading individuals with criminal convictions to participate in the democratic process" as a "direct result of . . . prosecutions" under the Law). The fact that the pre-amendment Law cannot be enforced on a prospective basis does not change this fact, since even eligible voters have refrained from voting based on their mistaken assumption that they nonetheless could face prosecution for doing so. *See, e.g.*, JA 1255 ("[I]ndividuals who have completed all aspects of their sentences" and therefore face no risk of prosecution under the Law nonetheless "have expressed fear that participating in the political process may result in prosecution").

Continued prosecutions under the pre-amendment Law would continue to harm Plaintiffs and interfere with their core mission to increase voter participation, particularly in the low-income and minority communities that they serve. *See* JA 1245 ("Unless this Court enjoins the enforcement of [the Law], this unjust and racially discriminatory law will continue to impair our efforts to increase political participation by Black, low-income North Carolinians."). Future prosecutions in the lead-up to elections would, like past prosecutions, likely receive widespread media attention. As a result of such publicity, especially around voters who made honest mistakes and were still prosecuted, more voters are likely to avoid voting altogether, either because they mistakenly believe they can be prosecuted under the pre-amendment Law for doing so or because they are uncertain whether they violated the pre-amendment Law in the past and would like to avoid scrutiny by appearing on the voter rolls for future elections. *See* JA 1242, JA 1249, JA 1251, JA 1255 (describing the chilling effect on prospective voters from publicity surrounding past prosecutions).

Defendants' arguments on appeal are based on a series of flawed premises. *First*, Defendants improperly seek to shift the burden of proof to Plaintiffs. Defendants thus repeatedly argue that Plaintiffs "cannot show that they still have a concrete interest" in the litigation. *See* Opening Br. at 25-26. But under Supreme Court precedent, the *Defendants* must show that the case has become moot because

the District Court could not grant *any* effectual relief at all.  *See, e.g.*, *West Virginia v. EPA*, 597 U.S. at 719; *Knox*, 567 U.S. at 307.  Here, the District Court provided a concrete benefit to Plaintiffs by enjoining further enforcement of the Law, thereby reducing the risk of voter confusion around the current state of the Law and protecting Plaintiffs' core mission from interference and an unwarranted drain on resources to educate prospective voters.  "However small" the benefit to Plaintiffs may have been from that decision, resolving the case in Plaintiffs' favor was "not simply a matter of academic debate," and that is "enough to save this case from mootness."  *Chafin v. Chafin*, 568 U.S. 165, 176 (2013); *see also Knox*, 567 U.S. at 307-08.

*Second*, Defendants criticize the District Court for not having analyzed mootness on a "claim-by-claim" basis.  Opening Br. at 27-28.  Defendants improperly overlook this Court's recent, controlling decision in *Lancaster*, 109 F.4th at 289, that the mootness inquiry "hinges on the type of relief sought," and not the underlying legal theory of individual causes of action.  Indeed, the out-of-Circuit cases Defendants cite are consistent with *Lancaster* and likewise show that the "claim-by-claim" analysis is focused on the different types of *relief* requested.  *See Smith v. Becerra*, 44 F.4th at 1247 ("We take a claim-by-claim approach to mootness and must decide whether a case is moot as to *each form of relief sought*.") (internal quotation marks and citation omitted); *Louie v. Dickson*, 964

F.3d 50, 54 (D.C. Cir. 2020) ("Each of [standing and mootness] applies to *each form of relief requested. . . .* We thus proceed claim by claim[.]"); *Chi. Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 815 (7th Cir. 2018) (noting that the mootness analysis "proceeds claim by claim" and citing *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011) ("[An] entire claim is not mooted simply because the *specific* relief it sought has been rendered moot[.]") (emphases added); *see also Audubon of Kan., Inc. v. United States DOI*, 67 F.4th 1093, 1102 (10th Cir. 2023) ("We evaluate mootness for each claim of relief sought.") (citing *Smith v. Becerra*, 44 F.4th at 1247). Defendants' suggestion that the District Court needed to analyze mootness on a "cause of action by cause of action" basis is both unsupported and inconsistent with *Lancaster*. Indeed, Defendants advocate for an even more fractured mootness analysis, arguing that the district court needed to analyze mootness separately for each *theory of liability* presented in the motion for summary judgment. *See* Opening Br. at 27-28. According to Defendants, because the district court used one of Plaintiffs' two vagueness challenges as an example in its mootness analysis and subsequently rejected that challenge on the merits, that "rejected claim has no bearing on whether Plaintiffs' other claims were moot." *Id.* at 28. Defendants cite no support whatsoever for this position, and the district court's clear finding that "Plaintiffs' claim that the [Law] is unconstitutionally

vague remains an unresolved grounds for Plaintiffs' challenge" (JA 1540) was not somehow limited to a sub-theory of Plaintiffs' overall Due Process challenge.

In addition, Defendants' "claim by claim" argument deviates sharply from the arguments they presented to the District Court. Defendants argued before the District Court that SB 747 deprived the court of jurisdiction as to all of Plaintiffs' claims. Defendants never argued that the court needed to separately analyze mootness as to each of Plaintiffs' claims. Defendants cannot now argue that the District Court should have adopted a different analysis using different standards. "[I]t is not the role of the district court to act as a roving advocate, providing legal arguments to the parties before it." *Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011); *see also Steves & Sons v. JELD-WEN, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021) ("'[I]t is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel,' and 'perfunctory and undeveloped arguments . . . are waived.'") (citation omitted); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) ("We will not . . . require the district courts to anticipate all arguments that clever counsel may present in some appellate future.").

*Third*, Defendants incorrectly argue that, because Plaintiffs' mission involves encouraging prospective voters to vote in future elections, the Law can no longer interfere with that mission because the Law in its pre-amendment form does

not apply to future elections.  Opening Br. at 24.  This argument is a red herring.

As Defendants concede, voters could still be prosecuted under the pre-amendment

Law for purported violations in past elections, as no statute of limitations applies to

such prosecutions.  *See* JA 1510.  The undisputed evidence further demonstrates

that over 200 cases remain subject to review for potential prosecution by DAs

across the state, and Defendants have never offered any evidence that they would

voluntarily refrain from pursuing those prosecutions in the future.  JA 1341-1367.

As with past prosecutions, future prosecutions under the pre-amendment Law (and

the publicity surrounding them) would have a chilling effect on prospective voters

that Plaintiffs are trying to encourage to vote in future elections.  Significantly, the

Supreme Court has established a "formidable burden" to establish mootness based

on a voluntary cessation of challenged conduct.  *Friends of the Earth*, 528 U.S. at

190.[3]  Defendants have not attempted to meet the Supreme Court's standard, either

in the District Court or this Court.

Defendants further incorrectly describe Plaintiffs' continued interest in the

litigation as "speculative," repeating the Magistrate Judge's analysis of this issue.

*See* Opening Br. at 26 (citing JA 1415-1416).  The District Court rejected that

---

[3]  *See also, e.g.*, *West Virginia v. EPA*, 597 U.S. at 720 (holding "[w]e do not
dismiss a case as moot" where defendant "nowhere suggest[ed] that if this
litigation is resolved in its favor it will not" continue the challenged conduct,
and had instead "vigorously defend[ed] the legality of such an approach").

argument in part because it was premised on case law analyzing standing, "involved no aspect of mootness," and was therefore inapplicable.  *See* JA 1538-1539.  Moreover, the Magistrate Judge's—and Defendants'—speculative chain fundamentally misunderstands Plaintiffs' get-out-the-vote activities and educational efforts.  Plaintiffs' activities and efforts are not dependent on affirmative outreach by potential voters seeking "clarification" about the state of the Law (as the Magistrate Judge suggested).  *See* JA 1416.  Instead, Plaintiffs and other organizations conduct affirmative outreach efforts, and those efforts have been impeded by misconceptions about the threat of prosecution under the Law.  *See* JA 1241-1242; JA 1248-1249; JA 1254-1256.  Plaintiffs' core and longstanding mission to encourage voter participation is therefore directly impacted by the Law, which would continue absent an injunction preventing further enforcement.  SB 747 does not provide a complete solution to the chilling effect impacting Plaintiffs' core mission for as long as the risk of prosecution under the pre-amendment Law persists.

*Fourth*, the District Court emphasized that "a superseding statute or regulation that changes a prior law must remedy the challenged aspects of the prior law in order for a case challenging that law to be deemed moot."  JA 1539 (citing *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 F. App'x 566, 570 (4th Cir. 2007)).  Applying that standard, the District Court found that there were multiple

"challenged aspects of the [Law] that have not been alleviated" by the addition of a scienter element on a prospective basis, and Defendants had failed to prove otherwise. JA 1540-1541; *see also* JA 1542 ("The Court holds that this matter is not rendered moot by Senate Bill 747, and the litigation shall proceed, specifically to address Plaintiffs' Summary Judgment Motion.").

As one example of an unremedied aspect of the Law, the District Court noted that Plaintiffs challenged, "among other things, that the [Law's] criminalization of voting before an individual has 'been restored to the right of citizenship,' . . . is unconstitutionally vague." JA 1540. The amended Law still included a reference to the restoration of an individual's right of citizenship, and thus related back to "an original concern of Plaintiffs." Therefore, "Plaintiffs' claim that the Challenged Statute is unconstitutionally vague remains an unresolved ground for Plaintiffs' challenge." *Id.* Because "the addition of the scienter requirement did not remedy an aspect of the [Law] that Plaintiffs assert as a ground for the Statute's unconstitutionality," the District Court concluded that Plaintiffs maintain a concrete interest in the outcome, and "Defendants have not proven otherwise." JA 1541. While the District Court ultimately ruled against Plaintiffs on the merits of that issue, that merits decision does not show that the Court could not grant any effective relief or that Plaintiffs lacked any interest, "however small" in the outcome. *Chafin*, 568 U.S. at 176. Rather, by declaring

the pre-amendment Law unconstitutional and enjoining further enforcement, the relief requested in Plaintiffs' Amended Complaint, the merits decision demonstrated that further relief was available.

## II. The District Court Properly Granted Summary Judgment for Plaintiffs Because the Law Is Unconstitutional

Having determined that Plaintiffs' claims were not mooted by SB 747, the District Court proceeded to address Plaintiffs' summary judgment motion on the merits and granted summary judgment as to both claims asserted in the Amended Complaint. In appealing from that decision, Defendants retread the same arguments that the District Court addressed and found wanting. None of these arguments would justify revisiting the District Court's well-reasoned decision.

### A. The Strict Liability Voting Law Is Unconstitutional Under the Equal Protection Clause

The Supreme Court has held that a statute violates the Equal Protection Clause if (i) "its original enactment was motivated by a desire to discriminate against [B]lacks on account of race"; and (ii) it "continues to this day to have that effect." *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). Defendants have conceded both points. *See* JA 1551 (noting Defendants' "extraordinary and telling concession" that they "do not contest that the historical background from the original enactments of 1877 and 1899 are indefensible . . . [or] that the law

currently impacts African-Americans at a higher rate than it does other citizens");
*see also* Opening Br. at 30.

Defendants' only argument to save the statute is that the Law's undisputed racist taint was purged in 1971 because of indirect changes to the "scope" of the Law through a constitutional amendment ratified in 1971. Opening Br. at 30-34. The District Court correctly rejected this unsupported indirect cleansing theory. Because Defendants point to no other amendment of the Law since its original enactment in 1877 and reenactment in 1899 that could have cleansed the statute of its racist history, Defendants' cleansing theory fails. *See* JA 1552-1558.

Before 1971, North Carolina's constitution provided that no person "found guilty of committing a felony against the State of North Carolina" could vote until that person had been "restored to the rights of citizenship." JA 529. In 1971, this provision was amended to include felonies against the United States and any felony in another state that also would be a felony if it had been committed in North Carolina. *See* JA 643, Art. VI, Sec. 2(3). Nothing in the text or history of that amendment, however, addressed the Law or the potential criminal ramifications for voting before a person had been "restored to the rights of citizenship." Defendants point to the State Constitution Study Commission that proposed the amended language (Opening Br. at 33), but the Commission did not suggest any connection between their proposed amendment and the Law. *See* JA

529.  Nor did Defendants offer any expert testimony or affidavit to support such a connection.

There is no evidence in the record to suggest that the Legislature even considered reenacting the Law when it approved the general provision in the constitution.  The District Court correctly held that Defendants had failed to "provide any connection" between the 1971 constitution and the Law.  JA 1556.  As the District Court further held, Defendants "present no evidence that the North Carolina Legislature considered the Challenged Statute in any way when they amended the Constitution, let alone intended to cleanse the [Law]").  *Id.*  Defendants do not address that finding on appeal.

Nor is there any evidence that the voters who were asked to ratify the constitutional amendment were told anything about the Law.  Defendants' suggestion that voters "willingly broadened" the Law in voting to ratify the constitution (Opening Br. at 33) is therefore incorrect and unsupported.  And, while the Defendants note that in 1973 the Legislature amended *Section 163-55* and other provisions in Chapter 163 (Opening Br. at 10, JA 661), that point only highlights that the Legislature *did not amend Section 163-275(5)*—the Law at issue here—after the constitutional amendment.  As the District Court noted, "[h]ad the Legislature wanted to cleanse the Challenged Statute of its discriminatory taint, it could have directly amended the Challenged Statute."  JA 1556.  Defendants do

not challenge those findings either.  Defendants cannot make up for the

Legislature's inaction through an unsupported theory of indirect cleansing.

Defendants also cannot cite any precedent for their indirect cleansing theory.

As the District Court correctly found, all cases that Defendants cited in their briefs

below (and repeated in their Opening Brief, *see* pages 31-32), were "easily

distinguishable" and provide no support for Defendants' argument that "amending

one law . . . can indirectly cleanse a wholly distinct law."  JA 1555.  In all those

cases, the subsequent reenactment or amendment had actually changed the specific

provision that was challenged as unconstitutional, which the North Carolina

Legislature did not do in 1971 or 1973.  *See Johnson v. Governor of Fla.*, 405 F.3d

1214, 1225 (11th Cir. 2005) (finding felon disenfranchisement provision

constitutional "because it was substantively altered and reenacted"); *Cotton v.

Fordice*, 157 F.3d 388, 391 (5th Cir. 1998) ("Because Mississippi's procedure

resulted both in 1950 and in 1968 in a re-enactment of § 241, each amendment

superseded the previous provision and removed the discriminatory taint associated

with the original version."); *Harness v. Watson*, 47 F.4th 296, 306 (5th Cir. 2022)

("This case is not analogous to *Hunter* because the provision has been, not only

reenacted, but reenacted twice[.]"); *Hayden v. Paterson*, 594 F.3d 150, 165 (2d Cir.

2010) (while plaintiffs alleged sufficient facts that constitutional provisions were

enacted with discriminatory purpose in 1821, 1846, and 1874, they had not made a

showing of "impermissible motive" underlying constitutional enactment in 1894). As the District Court observed, "[n]one of these cases address whether a constitutional amendment can cleanse a wholly separate statute." JA 1556.

Defendants also argue that because the drafters of the 1971 constitution intended to eliminate provisions that violated the U.S. Constitution, including a "provision on racial segregation in the public schools," and because the Law became indirectly broadened because of the constitutional amendment, the Law was therefore cleansed of its discriminatory taint. Opening Br. at 33. The District Court correctly rejected this "generous interpretation" of the constitutional amendment. JA 1557-1558. Only "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018). Nothing in the record suggests that the North Carolina Legislature "actually confront[ed]" the Strict Liability Voting Law's "tawdry past" when it adopted a separate amendment to the state constitution. *Ramos v. Louisiana*, 590 U.S. 83, 115 (2020) (Sotomayor, J., concurring in part). Because Defendants failed to demonstrate that the 1971 constitutional amendment or 1973 amendment of a different statute "fundamentally alter[ed]" the Strict Liability Voting Law such that it "eradicate[d]" its discriminatory taint, *McCrory*, 831 F.3d at 240, there is no basis to find that the Law's undisputed racist history and impact has been cleansed.

Finally, the District Court correctly held that the Law had not been cleansed, even accepting Defendants' theory, given its undisputed "lingering burden on Black voters." JA 1557 (citing *McCrory*, 831 F.3d at 240-41). Defendants do not dispute the disproportionate burden the Law has imposed on Black North Carolinians. *See* JA 1551. Thus, the District Court found that the 1971 and 1973 amendments presumably had the effect of "disenfranchis[ing] *more* Black people." JA 1557 (emphasis added). Such a legislative amendment cannot purge a racist law of its discriminatory history.

## B. The Strict Liability Voting Law Is Unconstitutional Under the Due Process Clause

The District Court also correctly concluded that the Law violates the Due Process Clause. Plaintiffs raised two Due Process challenges: *First*, that the Law is unconstitutionally vague because it fails to define when an individual has "been restored to the right of citizenship," thereby failing to give fair warning of what conduct is prohibited. *See* JA 318-320, JA 1328-1331. *Second*, that the Law is unconstitutionally vague in failing to provide clear standards to prevent arbitrary enforcement. *See* JA 320-322, JA 1331-1334. While the District Court denied summary judgment on the first argument, it correctly granted Plaintiffs summary judgment on the second argument given the undisputed record evidence demonstrating inconsistent enforcement by district attorneys. *See* JA 1558-1566.

This Court has the power to "affirm the district court's grant of summary judgment on an alternative ground." *Lowe v. Sporicidin Int'l*, 47 F.3d 124, 131 n.6 (4th Cir. 1995). Thus, should this Court find that the Law is unconstitutionally vague in failing to define when an individual "has been restored to the right of citizenship," an issue that was fully briefed and argued below, it can affirm the district court's grant of summary judgment on that basis. *See United States v. Flores-Granados*, 783 F.3d 487, 491 (4th Cir. 2015) ("We are entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court.") (internal quotation marks and citation omitted). In any event, this Court should affirm the District Court's grant of summary judgment based on the undisputed evidence of arbitrary enforcement demonstrating the Law's inherent vagueness.

### i. Plaintiffs Have Pursued Their Vagueness Challenge from the Outset of this Litigation

Defendants argue that Plaintiffs have asserted a "new theory of liability" related to the Law's inconsistent enforcement by the DAs. Opening Br. at 35-37. This argument is meritless. Defendants do not dispute that Plaintiffs have pursued a Due Process vagueness claim from the outset of this litigation. *See id.* at 34-35. Such claims arise in circumstances where the "State []tak[es] away life, liberty, or property under a law that fails to 'give a person of ordinary intelligence adequate notice of what conduct is prohibited' or lacks 'sufficient standards to prevent

arbitrary and discriminatory enforcement." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023). The original Complaint specifically alleged that the Law was void for vagueness (JA 97-99) and attached several of the declination letters that Plaintiffs attached to their motion for summary judgment. *Compare* Compl. Ex. 5 (ECF No. 1-5), *with* JA 1018-1031. The Amended Complaint alleged and incorporated the same. *See* JA 127-190. At summary judgment, Plaintiffs presented additional evidence revealed in discovery in support of the Due Process claim. Unlike in the cases Defendants cite, Plaintiffs have not raised any "new claims" distinct from the claims asserted in the complaint. *See* Opening Br. at 36; *Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (rejecting unpled malicious prosecution claim); *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (sustaining denial of motion for leave to amend complaint to add unpled negligent testing claim). Nor have Defendants offered any legal support for their contention that a vagueness claim based on arbitrary enforcement is a distinct claim that must be pleaded separate and apart from a vagueness claim based on inadequate notice of the punishable conduct. Indeed, Defendants' implicit suggestion that Plaintiffs would have needed to plead the precise legal theory it pursued at summary judgment in support of the Due Process Claim asserted in the complaint is directly contrary to the notice pleading standard. *See, e.g.*, *Guttman v. Constr. Program Grp. (In re Railworks Corp.)*, 760 F.3d 398,

403 (4th Cir. 2014) ("[W]e have long held that a plaintiff is not limited by any one specific legal theory set forth in the complaint.").  Finally, Defendants cannot claim unfair prejudice from being forced to address evidence relevant to Plaintiffs' Due Process claim that has been part of Plaintiffs' case from the outset.  *See, e.g.*, *State Farm Fire & Cas. Co. v. PPL Elec. Utils.*, 2017 WL 2532005, at *6 (E.D. Pa. June 9, 2017) ("Plaintiffs are not raising a new claim.  Rather, they assert an alternative theory of liability on the negligence claim that is supported by the allegations in the Complaint[.]").

### ii.     The District Court Correctly Held That the Law Is Unconstitutionally Vague

The District Court correctly found that the Law is unconstitutional under the Due Process Clause because it "does not provide sufficiently clear standards [to] prevent arbitrary enforcement."  JA 1563.  The District Court noted that "no disputes exist with respect to th[e] record evidence" showing "clearly inconsistent" interpretations of the required *mens rea* under the Law by the district attorneys tasked with enforcing the Law.  JA 1565.  Defendants' attempt to excuse such clear inconsistencies under the banner of "prosecutorial discretion" (Opening Br. at 37-44) is meritless.

While the Due Process Clause demands that a law provide adequate notice of prohibited conduct, "the more important aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law

enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citation omitted); *see also Carolina Youth Action Project*, 60 F.4th at 781. "Statutes must provide explicit standards for those who apply them to avoid resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Cunney v. Bd. of Trs. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). When considering the risks of arbitrary enforcement, courts place great weight on inconsistent interpretations by those charged with enforcing it. *See, e.g.*, *id.* at 622 ("Defendants' various interpretations of [ordinance's] requirements serve only to reinforce our view that the ordinance's vagueness authorizes arbitrary enforcement."); *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1330-31 (11th Cir. 2005) (testimony demonstrating that "members of the Code Enforcement division differed in their opinion of what [conduct] would trigger a violation" provided "evidence that the Code has an inherent risk of discriminatory enforcement" and "established the vagueness of the Code").

The undisputed record at summary judgment showed inconsistent enforcement by the DAs who enforce the Law. Some DAs have interpreted the Law to include an implicit scienter requirement, and have declined to prosecute violations where there was no evidence that the voter acted with fraudulent intent. These DAs have expressed their "belief that charges would require some showing

of *knowledge* that . . . [the] individual's right to vote had been suspended." JA

1022 (emphasis added). Of the cases referred from the 2016 general election audit,

several were "summarily declined because the [DAs] for those counties determined

there was insufficient evidence to prove that the defendant was ever notified of his

or her ineligibility to vote." JA 1018. By contrast, other DAs, including in

Alamance and Hoke Counties, have prosecuted voters who voted before felony-

sentence completion based on a mistaken belief that they were eligible to vote and

without any evidence of intent. *See* JA 1035-1039.

  The District Court correctly concluded that this undisputed record evidence

demonstrated that the Law "lacks sufficient standards to prevent arbitrary and

discriminatory enforcement." JA 1566 (citing *Carolina Youth Action Project*, 60

F.4th at 781). Importantly, the District Court drew a distinction between "(1) the

decision to pursue a case being based on whether or not the prosecutor believed

sufficient evidence is present and (2) the decision to pursue a case being based on

whether or not the prosecutor believes the criminalizing statute requires intent."

JA 1564. As the court explained, "[t]he rationale of the former involves

prosecutorial discretion, while the rationale of the latter can be explained by the

vagueness of the criminalizing statute." *Id.* Using this approach, the District Court

went on to hold that the undisputed record evidence demonstrated several instances

falling into the second category. JA 1565. In other words, because the record

evidence demonstrated that some prosecutors "believed that the Challenged Statute included a requirement of intent while others did not," the Law is unconstitutionally vague under the Due Process Clause. *Id.*

Defendants seek to contort the clear record evidence of prosecutors' inconsistent interpretation of the Law's requirements into "a thoughtful and practical exercise of prosecutorial discretion." Opening Br. at 41-42. This argument mistakenly conflates the DAs' ultimate discretionary decisions with the express rationale stated in their declination letters. The record establishes that DAs have repeatedly declined to prosecute potential violations of the Law based on their belief that doing so would require proof of intent to establish a prima facie violation. *See* JA 704-706, JA 708-709, JA 1022, JA 1023, JA 1024, JA 1033.

Defendants further state that the DAs who have declined prosecution have not specifically identified any vagueness in the Law. Opening Br. at 40. But that is beside the point. The declination letters clearly state several DAs' interpretation of the statute as requiring evidence of intent, while other DAs have prosecuted violations on a strict liability basis. *See, e.g.*, JA 1022 ("It is our belief that charges would *require some showing of knowledge* that each above listed individual's right to vote had been suspended."); JA 704 ("I question the wisdom of prosecuting offenders who lack the *requisite criminal intent*[.]"); JA 1033 ("In that this NCSBE investigation does not include documentation that the subject had actual

knowledge that his voting privileges were suspended while on probation . . . there is little chance the State would be able to *satisfy its burden of proof* at trial.") (emphases added).  In fact, the NCSBE has admitted that several matters it referred for potential prosecution were "summarily declined because the [DAs] for those counties determined there was insufficient evidence to prove that the defendant was ever notified of his or her ineligibility to vote."  JA 1018.  That missing evidence of knowledge would not have been necessary if the DAs believed the Law did not require a showing of scienter.  Defendants cannot avoid the clear conflict between the interpretation of the Law by several DAs and their own stated position that no scienter is required to obtain a conviction.  *See* JA 416.[4]

Defendants argue that the District Court overlooked that the DAs "based their decision on factors beyond the statute."  Opening Br. at 43.  That assertion is belied by the record evidence, which clearly reflects that the DAs based their decisions on inconsistent understandings of the statute's requirements.  None of the DA Defendants submitted affidavits in the District Court to provide admissible

---

[4]   The Opening Brief, while accusing Plaintiffs of presenting a "hand-picked" set of declination letters in their summary judgment motion (Opening Br. at 39), points to just one of the declination letters submitted by Plaintiffs, claiming that it reflects a DA's understanding that there is no intent requirement under the pre-amendment Law.  *See id.* at 42-43.  Defendants omit that this DA stated that notification and knowledge "*arguably* . . . are not required evidence to prove violation of the felon voter statute."  JA 709.  This letter therefore similarly reflects uncertainty as to the requirements of the statute.

evidence that they were actually exercising prosecutorial discretion rather than interpreting the statute as reflected in their letters. There is no basis to find the District Court's factual findings of inconsistent interpretation was incorrect or that there were any factual issues requiring a trial. Defendants cannot challenge the District Court's factual findings on the record presented through retrospective efforts to recharacterize unambiguous letters. Moreover, the fact that certain declination letters refer to other potential factors relevant to prosecution does not alter the fact that several DAs expressed their belief that evidence of intent was required under the statute while others did not. Such inconsistent understandings among the DAs—trained lawyers tasked with enforcing the Law—provides potent evidence of the Law's vagueness. *See Konikov*, 410 F.3d at 1330-31.

Finally, as this Court held in *Carolina Youth Action Project*, evidence of disparate impact can "confirm" that "[a] law fails to give sufficient guidance to prevent discriminatory enforcement." 60 F.4th at 784 & n.10. Defendants do not dispute the Law's disproportionate impact on Black citizens (JA 1551; Opening Br. at 30), and this disparity further demonstrates that the Law is impermissibly vague under the Due Process Clause.

## CONCLUSION

For reasons set forth herein, this Court should affirm the District Court's judgment declaring the Law in its pre-amendment form unconstitutional under the

Equal Protection and Due Process Clauses and enjoining further enforcement of

the Law.

Dated: December 23, 2024

By:   /s/ *Jonathan K. Youngwood*    

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
David Elbaum
Jacob Lundqvist
425 Lexington Avenue
New York, NY 10017
(212) 455-2000


SOUTHERN COALITION FOR SOCIAL JUSTICE
Mitchell D. Brown
Jeffrey Loperfido
Jacob H. Sussman
PO Box 51280
Durham, NC 27717
(919) 323-3380


*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __24-1512__    **Caption:** A. Philip Randolph Institute v. North Carolina State Boar

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ____12,673____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
MS Word _____ [*identify word processing program*] in
Times New Roman, 14 pt. _____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Jonathan K. Youngwood _____

Party Name _Appellees_____

Dated: _12/23/2024_____