**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-1512**

───────────

NORTH CAROLINA A. PHILIP RANDOLPH INSTITUTE; ACTION NC,

Plaintiffs – Appellees,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; FRANCIS X. DE LUCA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; SIOBHAN O'DUFFY MILLEN, in her official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; JEFF CARMON, III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS; STACY "FOUR" EGGERS, IV, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; ROBERT RUCHO, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; JEFF CRUDEN, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 1; THOMAS D. ANGLIM, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 2; KIM SCOTT, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 7; JEFF MARSIGLI, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 8; FARIS DIXON, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 3; MATTHEW DELBRIDGE, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 9; MATTHEW WAREHAM, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 4; NANCY LORRIN FREEMAN, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 10; ERNEST LEE, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 5; MICHAEL WATERS, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 11; JASON SMITH, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 6; SUZANNE MATTHEWS, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 12; JASON WALLER, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 13; MATTHEW C.

SCOTT, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 20; WILLIAM R. WEST, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 14; JAMIE ADAMS, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 21; JONATHAN M. DAVID, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 15; KATY GREGG, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 22; SATANA DEBERRY, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 16; TIM WATSON, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 23; SEAN BOONE, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 17; AVERY CRUMP, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 24; JEFFERY NIEMAN, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 18; ASHLIE SHANLEY, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 25; SPENCER MERRIWEATHER, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 26; SARAH M. KIRKMAN, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 32; BRANDY COOK, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 27; GARRY W. FRANK, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 33; T. LYNN CLODFELTER, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 28; TOM E. HORNER, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 34; MICHAEL K. HARDIN, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 29; ROBERT S. BANKS, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 35; TREY ROBISON, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 30; SCOTT REILLY, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 36; JAMES R. O'NEILL, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 31; ANDREW M. GREGSON, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 37; TRAVIS PAGE, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 38; ASHLEY HORNSBY WELCH, in her official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 43; MICHAEL W. MILLER, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 39; TODD M. WILLIAMS, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 40; TED BELL, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 41; ANDREW

MURRAY, in his official capacity as DISTRICT ATTORNEY FOR PROSECUTORIAL DISTRICT 42,

                         Defendants – Appellants.

————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, Senior District Judge.  (1:20−cv−00876−LCB−JLW)

————————

Argued:  May 9, 2025                              Decided:  September 12, 2025

————————

Before WYNN, HARRIS, and BENJAMIN, Circuit Judges.

————————

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge Wynn and Judge Harris joined.

————————

**ARGUED:**     Terence Steed, Elizabeth Curran O'Brien, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.  Jonathan K. Youngwood, SIMPSON THACHER & BARTLETT, LLP, New York, New York, for Appellees.  **ON BRIEF:**  Joshua H. Stein, Attorney General, Mary Carla Babb, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants.  David Elbaum, Jacob Lundqvist, SIMPSON THACHER & BARTLETT LLP, New York, New York; Mitchell Douglas Brown, Jeffrey Loperfido, Jacob H. Sussman, SOUTHERN COALITION FOR SOCIAL JUSTICE, Durham, North Carolina, for Appellees.

————————

DEANDREA GIST BENJAMIN, Circuit Judge:

The North Carolina A. Philip Randolph Institute and Action NC (collectively, "the Institute"), challenged the constitutionality of N.C. Gen. Stat. § 163-275(5) (2019) ("Challenged Statute"), which criminalizes the act of voting by disenfranchised felons—even if those individuals mistakenly believe they are eligible to vote. During the pendency of this case, the North Carolina General Assembly amended the Challenged Statute to include a scienter requirement effective January 1, 2024 ("Amended Statute"). After finding that the passage of the Amended Statute did not moot the Institute's challenge, the district court struck down the Challenged Statute. Because we agree with the district court that the case is not moot and the Challenged Statute violates the Equal Protection Clause, we affirm.

## I. Background

### A. Facts

We begin with an overview of North Carolina's history of felon disenfranchisement before turning to the history of the Challenged Statute.

#### i. Felon Disenfranchisement in North Carolina

As required by Reconstruction legislation, the North Carolina Constitution of 1868 prohibited slavery and granted Black men the right to vote. John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1777, 1779 (1992); N.C. Const. of 1868, art I, § 33; *id.* art. VI, § 1. The 1868 Constitution "did not expressly prohibit felons from voting." *Cmty. Success Initiative v. Moore*, 886 S.E.2d 16, 24 (N.C. 2023) (citing N.C.

4

Const. of 1868, art. II, § 13). It did, however, reproduce language first found in an 1835 amendment to the 1776 constitution that "noted the loss of citizenship rights by 'any person convicted of an infamous crime.' " *Id.* (first citing N.C. Const. of 1868, art. II, § 13; and then quoting N.C. Const. of 1776, amends. of 1835, art. I, § 4, cls. 3–4).

North Carolinians ratified the 1868 Constitution, but they did so "resent[fully]." *See* Orth, *North Carolina Constitutional History*, *supra*, at 1785 (quoting John L. Sanders, *A Brief History of the Constitutions of North Carolina*, *in* North Carolina Government, 1585–1979: A Narrative and Statistical History 798 (John L. Cheney, Jr. ed., 1981)). After all, the 1868 Constitutional Convention had been "called on the initiative of" the Radical Republican-controlled Federal Congress and heavily influenced by "Union loyalists, carpetbaggers," and Black North Carolinians. *Id.* at 1776, 1779. It should come as no surprise, then, that the pendulum quickly swung back, and North Carolina again sought to disenfranchise its Black citizens. *Id.* at 1779. Just two years after ratification, "prewar political forces reemerged . . . in the form of the Conservative Party[,] . . . won control of the [G]eneral [A]ssembly," and "immediately proposed a convention to replace the hated carpetbagger constitution."[1] *Id.* at 1781.

---

[1] The Conservative Party was "a loose political organization that first developed in North Carolina during the Civil War" in opposition to Unionists, and after the war, to Radical Republicans. Ronnie W. Faulkner, *Conservative Party*, Encyclopedia of North Carolina (William S. Powell ed., 2006), https://perma.cc/L6VP-Y8NX. But the "Conservative" moniker was fleeting. In 1876, the party officially renamed itself "the Democratic Party of North Carolina." *Id.*

Though this first attempt to call a constitutional convention failed, a subsequent attempt in 1875 did not.[2]  *Id.* at 1781–82.  The resultant convention proposed, and North Carolina voters ratified, thirty amendments.  *Id.* at 1782.  The amendments "contained several racially discriminatory measures."  *Cmty. Success Initiative*, 886 S.E.2d at 24–25.  Some of those measures, like the amendments outlawing interracial marriage and mandating school segregation, explicitly invoked race.  *See id.* at 25 (first citing N.C. Const. of 1868, amend. XXX of 1875; and then citing *id.* amend. XXVI).  Others, like those that consolidated political power in the General Assembly, were facially race-neutral but "had the deliberate effect of reducing the political influence of African Americans." *Id.* (citing N.C. Const. of 1868, amend XXV of 1875).

One such amendment "expressly den[ied] the franchise to individuals convicted of felonies" for the first time.  *Id.* (quoting N.C. Const. of 1868, amend. XXIV of 1875). Though the amendment bears no mention of race, at the time of its conception, Black men "figured in [the ruling party's] imaginations as rapists and thieves who plundered white women's virtue and robbed white men of political authority."  J.A. 356.[3]  That racist

---

[2] When the Conservative Party first proposed a constitutional convention in 1870, they voluntarily "submit[ted] the issue to the voters . . . and suffered an embarrassing defeat."  John V. Orth, *North Carolina Constitutional History*, 70 N.C. L. Rev. 1759, 1781 (1992).  When the Conservative Party again called for a constitutional convention in 1875, they chose not to submit the question to the voters at all.  *Id.* at 1782.

[3] Citations to "J.A." refer to the joint appendix filed by the parties.  The J.A. contains the record on appeal from the district court.  Page numbers for citations to the J.A. utilize the "JA#" pagination on each document.

mythology fed into the "common[] underst[anding]" of the day "that 'nearly every man convicted of a felony'" was Black. *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 730 F. Supp. 3d 185, 193 (M.D.N.C. 2024).

Nearly a century later—and in the wake of the Civil Rights Movement—the General Assembly passed, and North Carolina's citizens ratified, a new state constitution ("1971 Constitution"). The preexisting constitution had "contain[ed] several provisions . . . such as the provision on racial segregation in the public schools," J.A. 450, that, following the Civil Rights era, were recognized as unconstitutional, and which the state sought to "eliminate," J.A. 455.[4] Relevant here, the 1971 Constitution updated the preexisting constitutional provision governing felon disenfranchisement to "extend[] that bar to those who have been convicted of felonies against the United States or another state" ("Constitutional Provision"). *Id.* at 529; N.C. Const. of 1971, art. VI, § 2. In 1973, the General Assembly updated the statutory provision outlining "qualifications [for] . . . [and] exclusion from [the] electoral franchise" to reflect that change. J.A. 661; 1973 N.C. Sess. Laws 793, sec. 18; § 163-55. The text and history of the 1971 Constitution and 1973 statutory amendment do not reference the Challenged Statute in any way.

### ii. The Challenged Statute

Following on the heels of the 1875 amendments, in 1877, the General Assembly first "criminalized voting by felons whose rights had not been restored." *Cmty. Success*

---

[4] It was not North Carolina itself that recognized these provisions as "invalid," J.A. 450—rather, the United States Supreme Court required it. *Brown v. Bd. of Ed.*, 347 U.S. 483 (1954), *supplemented sub nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955).

*Initiative*, 886 S.E.2d at 25 (citing An Act to Regulate Elections, ch. 275, §§ 10, 62, 1877

N.C. Sess. Laws 516, 519–20, 537); J.A. 410.  The Challenged Statute's progenitor read:

> [I]f any person so convicted shall vote at any election, without having been
> legally restored to the rights of citizenship, he shall be deemed guilty of an
> infamous crime, and, on conviction thereof, shall be punished by a fine not
> exceeding one thousand dollars, or imprisonment at hard labor not exceeding
> two years, or both.

1876–77 N.C. Sess. Laws 537.

Like the constitutional provision governing felon disenfranchisement, though the

statute itself contains no reference to race, contemporaneous primary sources show that the

law was designed to disenfranchise Black men based on the "common[] underst[anding]

that 'nearly every man convicted of a felony' " was Black.  *N.C. A. Philip Randolph Inst.*,

730 F. Supp. 3d at 193 (citation omitted); J.A. 356–57 (collecting sources); *id.* 358–61

(detailing how historically, North Carolina's "system of state incarceration

. . . [disproportionately] bound [B]lack men to forced labor and effectively disenfranchised

them for life").  Rather than viewing felon disenfranchisement as discriminating against

individual Black voters, North Carolina Democrats viewed the practice as discrimination

" 'against certain characteristics of [their] race.' "  J.A. 356 (quoting William A. Mabry,

*The Negro in North Carolina Politics Since Reconstruction*, Historical Papers of the Trinity

College Historical Society, series 23 (Durham: Duke University Press, 1940), 16–17).  As

a result, it could "be used to exclude significant numbers of [B]lack men from polling

places based on supposition rather than proof of a criminal conviction."  *Id.*

In 1899, the General Assembly reenacted the 1877 version of the Challenged Statute

essentially unchanged:

> [I]f any person so convicted shall vote at the election without having been restored to the rights of citizenship he shall be guilty of an infamous crime and punished by a fine not exceeding one thousand dollars or imprisoned at hard labor not exceeding two years or both.

1899 N.C. Sess. Laws 681; J.A. 429.  The law underwent a handful of minor changes in 1931: "[its] language was streamlined, and its scope was expanded to include primary elections."  *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 193 (citing 1931 N.C. Sess. Laws 441–45).  It then read:

> It shall be unlawful: . . . For any person, convicted of a crime which excludes him from the right of suffrage, to vote at any primary or election without having been restored to the right of citizenship in due course and by the method provided by law[.]

1931 N.C. Sess. Laws 444; J.A. 434–35.  Barring the substitution of "person" for "him," the Challenged Statute "remained virtually unchanged" until the recent passage of the Amended Statute.  *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 193; *see id.* at 193 n.4 (first citing 1931 N.C. Sess. Laws 444; and then citing N.C. Gen. Stat. § 163-275(5) (2019)).

When the Institute brought this action in 2020, the Challenged Statute made it a Class I felony:

> For any person convicted of a crime which excludes the person from the right of suffrage, to vote at any primary or election *without having been restored to the right of citizenship* in due course and by the method provided by law.

N.C. Gen. Stat. § 163-275(5) (2019) (emphasis added).  Though the statute contained no scienter requirement, some district attorneys' offices interpreted the Challenged Statute to "require some showing of knowledge that each . . . individual's right to vote had been suspended."  *See, e.g.*, J.A. 1022, 1033.  Others prosecuted violators without concern for

defendants' intent.  *See, e.g.*, *id.* 1035–39; *see also* Jack Healy, *Arrested, Jailed and Charged With a Felony. For Voting.*, N.Y. Times (Aug. 2, 2018), https://perma.cc/5YFP-H3H5.  Across the state, prosecutions under the Challenged Statute disproportionately impacted Black North Carolinians relative to not only North Carolina's general population, but also to its incarcerated and formerly incarcerated populations.

In 2023, the General Assembly enacted Senate Bill 747, which added a scienter requirement to the Challenged Statute.  S.B. 747, 2023 Gen. Assem., Reg. Sess. § 38 (N.C. 2023).  The Amended Statute became effective on January 1, 2024, and made it a Class I felony:

> For any person convicted of a crime which excludes the person from the right of suffrage, to vote in any primary or election *knowing the right of citizenship has not been restored* in due course and by the method provided by law.

N.C. Gen. Stat. § 163-275(5) (2024) (emphasis added); *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 190.

## B. Procedural History

We turn now to the proceedings in this case.  In its operative first amended complaint, the Institute sued the North Carolina State Board of Elections, its members, and the district attorneys of North Carolina (collectively, "the Board"), alleging that the Challenged Statute violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution.  *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 190.  After the district court denied the district attorneys' motion to dismiss, the Institute moved for summary judgment.  The Board opposed the motion.

After summary judgment briefing was complete, the General Assembly amended the Challenged Statute to include a scienter requirement effective on January 1, 2024. The magistrate judge ordered supplemental briefing on the impact of the Amended Statute on the suit. *See N. C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, No. 1:20CV876, 2024 WL 21646, at *5 (M.D.N.C. Jan. 2, 2024), *report and recommendation adopted in part, rejected in part*, No. 1:20CV876, 2024 WL 1717482 (M.D.N.C. Apr. 22, 2024) The magistrate judge recommended the Institute's motion "be denied as moot, and the action be dismissed for lack of subject matter jurisdiction" because the Institute "lack[ed] standing to [continue to] pursue [its] claims." *Id.* at *1.

After finding that the magistrate judge incorrectly analyzed the viability of the suit under the doctrine of standing rather than mootness, the district court found that the Amended Statute did not moot the case because the court could still grant "effectual relief . . . by declaring the Challenged Statute unconstitutional and enjoining [its] enforcement." *N.C. State Bd. of Elections*, 2024 WL 1717482, at *3, 6. And in a separate order, the district court granted the Institute's motion for summary judgment in full, finding the Challenged Statute violated the Equal Protection and Due Process Clauses, and enjoined enforcement of the Challenged Statute. *N. C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 203.

The Board timely appealed. We have jurisdiction. 28 U.S.C. § 1291.

## II. Mootness

We review questions of subject matter jurisdiction de novo and the underlying factual determinations for clear error. *See Capitol Broad. Co. v. City of Raleigh*, 104 F.4th

11

536, 539 (4th Cir. 2024) (quoting *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 815 (4th Cir. 2004) (en banc)); *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 645 (4th Cir. 2018). A factual determination is "clearly erroneous" only if we are "left with the definite and firm conviction that a mistake has been committed." *Cunningham*, 888 F.3d at 645 (quoting *HSBC Bank USA v. F & M Bank N. Va.*, 246 F.3d 335, 338 (4th Cir. 2001)).

A. Law

"Our jurisdiction under Article III is limited to 'live' cases and controversies." *Sharma v. Hirsch*, 121 F.4th 1033, 1042 (4th Cir. 2024) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). But "[i]t is the doctrine of *mootness*, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit.' " *West Virginia v. EPA*, 597 U.S. 697, 719 (2022) (second and third alterations in original) (quoting *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *See United States v. Ketter*, 908 F.3d 61, 65 (4th Cir. 2018) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation marks omitted)). "But the bar for maintaining a legally cognizable claim is not high: 'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.' " *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 604 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). That is to say, "[a] case becomes moot only when it is *impossible* for a court to

grant *any* effectual relief whatever to the prevailing party." *Ketter*, 908 F.3d at 65 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).

## B. Party Arguments

The Board argues that the Institute's "concrete interest" no longer exists because its interest was derived from the Challenged Statute's "interfere[nce] with [its] ability to encourage *prospective* voters to vote in *future* elections," and the passage of the Amended Statute forecloses prosecutions under the Challenged Statute in future elections. Appellants' Br. (ECF No. 72) at 31–33 (hereinafter "Opening Br.").[5]  And the Board characterizes the Institute's claims that continued risk of prosecution under the Challenged Statute for pre-2024 conduct could cause confusion as " 'speculation,' . . . rest[ing] on the occurrence of an unlikely chain of events[.]" *Id.* at 33–34 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001)).

The Institute argues that new prosecutions under the Challenged Statute for pre-2024 conduct "would generate publicity and voter confusion about the state of the Law[,] . . . lead[ing] prospective voters to second-guess their eligibility and avoid the ballot box altogether so as to not expose themselves to a perceived risk of prosecution."  Appellees' Br. (ECF No. 73) at 41–42 (hereinafter "Resp. Br.").  This would in turn "interfere with [the Institute's] core mission to increase voter participation, particularly in the low-income and minority communities that [it] serve[s]." *Id.* at 43.

---

[5] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

C. Analysis

We agree with the Institute. Because we may still grant "effectual relief," the case is not moot. *See Ketter*, 908 F.3d at 65 (quoting *Knox*, 567 U.S. at 307).

The Board has acknowledged that prosecutions under the Challenged Statute for pre-2024 conduct may continue despite the Amended Statute. J.A. 1510; Oral Argument at 10:19–40, 14:50–15:10, *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections* (No. 24-1512), https://www.ca4.uscourts.gov/OAarchive/mp3/24-1512-20250509.mp3. The Board characterizes continued prosecutions as "a possibility" but not "a probability." J.A. 1510. But this itself seems improbable, as it is unclear why the Board would challenge the district court's injunction against the Challenged Statute's enforcement if not to allow enforcement of that statute.[6] So, we proceed with the understanding that without the district court's injunction, prosecutions under the Challenged Statute would continue.

The record supports the Institute's position that prosecutions under the Challenged Statute would likely have a chilling effect on voter registration in the communities it serves. Resp. Br. at 47; *see, e.g.,* J.A. 1242 ("Recent prosecutions under [the Challenged Statute] have really frightened people who might otherwise have been willing to register to vote and cast a ballot."); *id.* 1249–50 ("These prosecutions have had a huge chilling effect on the members of the communities we serve. . . . These individuals are terrified of doing

---

[6] For example, at the time of summary judgment, the "record reflected that over 200 cases remained subject to review for potential prosecution by DAs across the state." Response Br. at 30 (citing J.A. 1341–67) (North Carolina State Board of Elections complaint master list). Nothing in the record before us indicates whether any of those cases have been dismissed with prejudice.

14

something wrong by accident and then ending up facing charges for an honest mistake."); *id.* 1251 ("When individuals are prosecuted for voting, it has a terrible ripple effect through the whole community. People would rather avoid voting entirely than risk criminal charges for a mistake."); *id.* 1255 ("As a direct result of the [Challenged Statute] prosecutions, [we] ha[ve] had a significantly harder time persuading [eligible voters] with criminal convictions to participate in the democratic process[.]").

The record also supports the Institute's position that the ensuing voter confusion has historically created "an unwarranted drain on resources to educate" uncertain or frightened "prospective voters." Resp. Br. at 44; *see, e.g.,* J.A. 1242 ("[The North Carolina A. Philip Randolph Institute] has diverted substantial time and resources from its voter registration and get-out-the-vote activities to reassure eligible individuals that voting will not lead to criminal prosecution."); *id.* 1250 ("Action NC has diverted substantial time and resources from its voter registration and get-out-the-vote activities to reassure eligible individuals that voting will not lead to criminal prosecution.").

The fact that prosecutions under the Challenged Statute could not be brought for *future* conduct is of no consequence. It is certainly plausible that prospective voters who hear of prosecutions under the Challenged Statute may not be aware of the existence of the Amended Statute, let alone the nuances of the provisions' enforcement. Indeed, we ourselves find it puzzling that the Challenged Statute and the Amended Statute might somehow be simultaneously enforceable. So, when presented with stories of continuing criminal charges for mistakenly voting, it is not a stretch to imagine that eligible community members—a group we presume generally to have less experience parsing

15

legislative history than members of the federal bench—might not understand that *they* as new registrants could not be prosecuted for the same.  *Cf.* Resp. Br. at 42 (" '[I]ndividuals who have completed all aspects of their sentences' and therefore face no risk of prosecution under the Law nonetheless 'have expressed fear that participating in the political process may result in prosecution.' " (alteration in original) (quoting J.A. 1255)).

Enjoining enforcement of the Challenged Statute would forestall these obstacles to the Institute's "core mission" of "increasing political participation by members of low-income, minority communities."  *See id.* at 10, 43.  Because this court may still grant "effectual relief," *see Ketter*, 908 F.3d at 65 (quoting *Knox*, 567 U.S. at 307), the Institute retains "a concrete interest . . . in the outcome of th[is] litigation," and "the case is not moot."  *See Grimm*, 972 F.3d at 604 (quoting *Chafin*, 568 U.S. at 172).

### III. Equal Protection Clause

"We review de novo the district court's rulings concerning the constitutionality of a state statute."  *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (citing *Miller v. Brown*, 503 F.3d 360, 364 (4th Cir. 2007)).  We review underlying factual determinations, including "the ultimate factual question of a legislature's discriminatory motivation," for clear error.  *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 219–20 (4th Cir. 2016) (collecting cases).  Where, as here, "a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger[.]"  *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citing *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997)).

### A. Law

16

i. Equal Protection and *Arlington Heights*

The "central purpose" of the Equal Protection Clause is to "prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 6421 (1993) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)); U.S. Const. amend. XIV, § 1.  A facially race-neutral policy may violate the Equal Protection Clause if, when "applied evenhandedly[,] [it] results in a racially disproportionate impact and was motivated by discriminatory intent." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 879 (4th Cir. 2023), *cert. denied*, 218 L. Ed. 2d 71 (Feb. 20, 2024) (first citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977); and then citing *Washington*, 426 U.S. at 242).  We evaluate the constitutionality of such laws under the framework first laid out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.  See* 429 U.S. at 265–69.

"Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (citing *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999)).  At step one, the challenger must show "that racial discrimination was a 'substantial' or 'motivating' factor behind enactment of the law." *Id.* (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).  In our evaluation of the legislature's motivations, we consider the law's "(1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law 'bears more heavily on one race than another.' " *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–69).

17

If the challenger succeeds at step one, " 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without' racial discrimination." *Id.* (quoting *Hunter*, 471 U.S. at 228). At this step, "judicial deference to the legislature 'is no longer justified.' " *Id.* (quoting *Arlington Heights*, 429 U.S. at 265–66). Instead, the district court "must 'scrutinize the legislature's *actual* nonracial motivations to determine whether they *alone* can justify the legislature's choices.' " *Id.* (quoting *McCrory*, 831 F.3d at 221).

ii. *Abbott*, *Sanchez-Garcia*, and Past Discrimination

Under *Arlington Heights*, past discrimination may be relevant to the historical background of a law enacted during a subsequent legislative session. *Abbott*, 585 U.S. at 603–04 (citing *Arlington Heights*, 429 U.S. at 267). But, as the Supreme Court made clear in *Abbott v. Perez*, "[p]ast discrimination" by an earlier legislature "cannot, in the manner of original sin, condemn [subsequent] governmental action that is not itself unlawful." *See id.* at 603 (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)). Even if the later legislature does not "expressly disavow the prior act's racism," it is still entitled to its own presumption of legislative good faith, regardless of the sins of its predecessor. *See United States v. Sanchez-Garcia*, 98 F.4th 90, 99 (4th Cir. 2024) (quoting *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1151 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 703 (2024)).

This court most recently revisited *Abbott* in *United States v. Sanchez-Garcia*, 98 F.4th 90 (4th Cir. 2024). There, a group of "non-citizens indicted for illegally reentering the United States following their prior removal, in violation of 8 U.S.C. § 1326 . . . moved to dismiss their indictments on the ground that § 1326 . . . was enacted with a racially

18

discriminatory purpose," and therefore unconstitutional. *Sanchez-Garcia*, 98 F.4th at 94. The noncitizens argued that "one of § 1326's three predecessor offenses," referred to as the 1929 Act, "was enacted with racially discriminatory intent." *Id.* at 99. So, they posited, by "pass[ing] § 1326 in 1952 without addressing and 'repudiating' [the 1929 Congress'] racial animus," the 1952 Congress "demonstrated its continued discriminatory purpose." *Id.*

The court rejected the noncitizens' argument because, under *Abbott*, "a finding of past discrimination does not by itself overcome the presumption of good faith, and . . . a future legislature has no 'duty to purge its predecessor's allegedly discriminatory intent.' " *Id.* (quoting *Abbott*, 585 U.S. at 605–06). And the court rejected defendants' argument that "the 1952 Congress simply 'recodified' or 'reenacted' the 1929 Act." *Id.* at 100. The 1929 Act was only one of § 1326's three predecessor statutes, "and incorporated from each of them while making substantial revisions and additions." *Id.* (citing *Carrillo-Lopez*, 68 F.4th at 1151). And further still, in enacting the broader Immigration and Nationality Act in which § 1326 appears, the court acknowledged the act's "distinctly 'antiracist component' " in its "eliminat[ion] [of] racial bars to naturalization and other forms of racial discrimination in admissions." *Id.* at 102 (citations omitted). So, with the 1929 Act viewed as merely an element of § 1326's historical background, the court concluded that the challengers failed to "me[et] their burden of demonstrating that discrimination based on race was a motivating factor behind enactment of § 1326." *Id.*

B. Party Arguments

The Board "do[es] not contest that the historical background from the original enactments of 1877 and 1899 is indefensible" or that the Challenged Statute "currently has a disparate impact on Black North Carolinians." Opening Br. at 38. Instead, it argues that "the substantive changes to the scope of [the Challenged Statute] resulting from the new 1971 Constitution proposed by the General Assembly and ratified by the voters" created "a legally significant historical break between the original statute enacted in 1877 and 1899" and the Challenged Statute. *Id.* at 38–39. The Board claims that the willful broadening of the felon disenfranchisement provision in the 1971 Constitution by the General Assembly and the voters "purge[d] the taint" of discriminatory intent from the Challenged Statute—what the district court labeled the "indirect cleansing theory." *Id.* at 39–42; *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 196.

The Institute argues that "indirect changes to the 'scope' of the [Challenged Statute] through [the Constitutional Provision]" do not cleanse the Challenged Statute itself "of its racist history[.]" Resp. Br. at 51. It notes that the Board "present[ed] no evidence that the [General Assembly] considered the Challenged Statute in any way when they amended the Constitution," nor that "the voters who were asked to ratify the [C]onstitutional [Provision] were told anything about the [Challenged Statute]." *Id.* at 52. The Institute points out that the 1971 General Assembly amended other provisions in Chapter 163, including the section governing exclusion from electoral franchise. *Id.* (citing J.A. 661). By contrast, it argues, the lack of change to the Challenged Statute suggests that if the General Assembly intended to alter or "cleanse" the Challenged Statute, they would have. *Id.*; J.A. 661.

C. Analysis

20

We agree with the Institute. The district court correctly struck down the Challenged Statute, and in doing so, rejected the Board's "indirect cleansing" theory.

It is undisputed that the original 1877 enactment and 1899 reenactment of the Challenged Statute were motivated by racial animus and that the Challenged Statute continues to disproportionately impact Black North Carolinians. *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 194 ("Defendants, in an extraordinary and telling concession, 'do not contest that the historical background from the original enactments of 1877 and 1899 are indefensible. Defendants further do not contest that the law currently impacts African-Americans at a higher rate than it does other citizens.' "); *see also* J.A. 804–08, 1156, 1161–65, 1170, 1218, 1231–32. Felon disenfranchisement in North Carolina was grounded in the widespread belief that "nearly every man convicted of a felony" was Black. *See* J.A. 356; *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 193 (describing history of felon disenfranchisement in North Carolina); *Cmty. Success Initiative*, 886 S.E.2d at 24–25 (same). Just two years after a series of racially- and politically-motivated constitutional changes—and propelled by the same wave of racism and resentment—the General Assembly enacted the Challenged Statute "to further restore the 'purity of the ballot' and discriminate 'against certain characteristics of [the Black] race.' " *See N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 193; J.A. 356; *see also Cmty. Success Initiative*, 886 S.E.2d at 25; *see also* Orth, *North Carolina Constitutional History*, *supra*, at 1779–82.

All that remains for us to consider is the impact of the 1971 Constitution on our weighing of legislative intent. The Board's argument about a later legislature's enactment "purg[ing] the taint" of an earlier legislature's discriminatory intent misunderstands

*Raymond*, and through it, *Abbott*. *See* Opening Br. at 39–40 (quoting *Raymond*, 981 F.3d at 305). In *Raymond*, the court referenced the district court's language about "purg[ing] the taint of [a] prior law" in a summary of a *rejection* of that very reasoning. *See* 981 F.3d at 304–05. As the court explained, forcing the legislature "to 'bear the risk of nonpersuasion with respect to intent' " by asking them to show they had taken steps to cleanse the discriminatory intent was "unmistakable error." *Id.* at 303–05 (citations omitted). Doing so contravened *Abbott*'s directive to apply the presumption of legislative good faith, regardless of past discrimination. *Id.* at 303 (citing *Abbott*, 585 U.S. at 603–04).

If in 1971, the General Assembly had amended the Challenged Statute, *Abbott* would cabin the earlier legislature's discriminatory intent to "historical background" of the 1971 General Assembly's intent. *See Raymond*, 981 F.3d at 305 (first citing *Arlington Heights*, 429 U.S. at 267; and then citing *Abbott*, 585 U.S. at 604). But—and "there's the rub"[7]—the General Assembly decidedly did *not* modify the Challenged Statute. There is no new enactment of the Challenged Statute by a subsequent legislature to speak of. By contrast, *Abbott* and our cases applying it all have involved presuming good faith as to a later legislature's new enactment despite it sharing proverbial DNA with a problematic predecessor. *See, e.g.*, *Abbott*, 585 U.S. at 603–05 (holding that district court improperly imputed 2011 Texas Legislature's alleged discriminatory intent from 2011 redistricting

---

[7] William Shakespeare, Hamlet act 3, sc. 1, l. 66; *see also 'There's The Rub', Meaning & Context*, No Sweat Shakespeare, https://perma.cc/CC5J-XLUE ("The idiom 'there's the rub' means 'there's the problem' or 'there's the catch.' It is used to express a difficulty or obstacle that prevents a desired outcome.").

plans onto 2013 Texas Legislature's new, court-ordered 2013 redistricting plans); *Raymond*, 981 F.3d at 303–05 (reversing district court for failure to apply presumption of legislative good faith to 2018 North Carolina Legislature's voter ID law based on discriminatory 2013 voter ID law); *Sanchez-Garcia*, 98 F.4th at 99–102 (upholding 1952 version 8 U.S.C. § 1326 despite 1929 predecessor motivated by racial animus). Not so here.

The Challenged Statute and Constitutional Provision are two separate, nonsequential pieces of legislation. The Constitutional Provision amendment is part of the Challenged Statute's heritage only insofar as the Constitutional Provision determines which crimes result in the loss of the franchise, and thus who becomes vulnerable to prosecution under the Challenged Statute. There is no other link between the two. Nothing in the history of the 1971 Constitution suggests that in updating which felonies would fall under the Constitutional Provision, the General Assembly even considered the Challenged Statute. *Contra Raymond*, 981 F.3d at 299 (intervening constitutional amendment considered in *Arlington Heights* analysis of new voting law "required that all voters in North Carolina 'offering to vote in person [ ] present photographic identification before voting' and directed that the General Assembly 'shall enact general laws governing the requirements of such photographic identification, which may include exceptions' ").

It may very well be that "the drafters of the [1971] Constitution expressed the motivation to eliminate 'provisions that are invalid because [they are] in conflict with the Constitution of the United States, such as the provision on racial segregation in the public schools.' " Opening Br. at 41 (second alteration in original) (citations omitted). So too

that, simultaneously, the drafters "willingly broadened" the scope of the felon disenfranchisement amendment.[8]  *See id.*  But those changes have no bearing on the discriminatory intent behind the Challenged Statute, which was *not* altered in 1971. Broadening of the scope of the Constitutional Provision and its corresponding statutory provision, thereby inadvertently broadening the scope of the Challenged Statute, does not render the amendment and the statute interchangeable.  There is simply no sign that through the 1971 Constitution, the General Assembly intended to modify the Challenged Statute. *See N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 197 ("[The Board] present[ed] no evidence that the [General Assembly] considered the Challenged Statute in any way when they amended the Constitution[.]").

Put plainly, there has been no *direct*, substantive change to the Challenged Statute itself since 1899.  Having disposed of the Board's lone defense of the Challenged Statute, we are left with a statute which has remained essentially unchanged since the late nineteenth century.  While the 1877 General Assembly's intent might arguably be "historical background," the 1899 General Assembly's intent is not so limited. Acknowledging the 1899 legislature's discriminatory intent is not "condemn[ing] [subsequent] governmental action that is not itself unlawful" because there has been no subsequent, potentially lawful government action.  *See Abbott*, 585 U.S. at 603 (quoting *Mobile*, 446 U.S. at 74).  The 1899 General Assembly is the legislature responsible for the

---

[8] The Board suggests that ratification shows the voters also "willingly broadened" the scope of the felon disenfranchisement amendment.  But nothing in the record suggests that the broadening of the amendment was specifically highlighted to or put before voters— only the ratification of the changes as a whole.

operative form of the Challenged Statute. And as the record shows (and the Board concedes), the 1899 reenactment of the Challenged Statute is "indefensible." Opening Br. at 38.

Because the Challenged Statute's relevant "enactment was motivated by a desire to discriminate against [Black North Carolinians] on account of race and . . . continues to this day to have that effect[,] . . . it violates equal protection under *Arlington Heights*." *See Hunter*, 471 U.S. at 233. We therefore affirm the district court's grant of summary judgment to the Institute on Equal Protection Grounds.[9]

## IV. Conclusion

For the foregoing reasons, the district court court's judgment is

*AFFIRMED.*

---

[9] The district court also granted summary judgment on the ground that the Challenged Statute violates the Due Process Clause of the Fourteenth Amendment. *N.C. A. Philip Randolph Inst.*, 730 F. Supp. 3d at 202. We decline to address this issue and affirm solely on the ground that the Challenged Statute violates the Equal Protection Clause.